**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **LIBERTARIAN NATIONAL COMMITTEE, INC.,** | |
| Plaintiff, | Civil Action No. 11-cv-562 (RLW) |
| v. | |
| **FEDERAL ELECTION COMMISSION**, | |
| Defendant. | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Libertarian National Committee, Inc. ("LNC") has been left a bequest that it is unable to take in one lump sum payment because Defendant Federal Election Commission ("FEC") believes that, due to the large amount of the bequest, to do so would violate the Federal Election Campaign Act, 2 U.S.C. §§ 431-57. The FEC instead requires, as they have for decades, that the LNC receive annual payments from the bequest at the maximum contribution amount a living individual could donate. Thus the LNC will receive the full bequest, but over a number of years. The LNC does not want to wait, and challenges the constitutionality of the Federal Election Campaign Act ("FECA") as applied to bequests. As part of this challenge, the LNC asks this Court to enjoin the FEC from enforcing the FECA with respect to bequests, and also requests this Court, pursuant to 2 U.S.C. § 437h, to certify one question to the en banc United States Court of Appeals for the District of Columbia. The FEC has opposed the motion for certification, and moved for summary judgment. The parties appeared before this Court for oral argument on the pending motions on February 25, 2013. Based on the parties' briefs, the arguments presented to this Court, and a review of the relevant law, for the reasons stated below the LNC's motion to certify (Dkt. No. 25) is **GRANTED IN PART** and **DENIED IN PART**,

and the FEC's motion for summary judgment (Dkt. No. 29) is **GRANTED IN PART** and **DENIED IN PART**.

## I.     History of This Case

Raymond Groves Burrington died on April 26, 2007.  (Dkt. No. 13, ¶ 14).  His will left a residuary bequest to the LNC of an amount eventually determined to be $217,734.00.  (Id.).  The LNC is the national committee of the Libertarian Party of the United States.  (Dkt. No. 25-3, ¶ 1).  Prior to the bequest, Burrington had made only one donation to the Libertarian Party:  a $25.00 gift on May 19, 1998.  (Id. ¶ 26).  The Libertarian Party had no knowledge of Burrington's bequest until after his passing.  (Id. ¶ 25).

Pursuant to 2 U.S.C. § 441a(a)(1), no "person" can contribute more than $32,400.00 to a national political committee annually.[1]  In addition, pursuant to 2 U.S.C. §441i(a)(1), no political committee can "solicit, receive or direct to another person" any amount not subject to 2 U.S.C. § 441a(a)(1).  The statute defines "person" as follows:  "The term 'person' includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term does not include the Federal Government or any authority of the Federal Government."  2 U.S.C. § 431(11).

The FEC has determined that the word "person" in 2 U.S.C. § 441a(a)(1) includes testamentary estates.  See, e.g., FEC Advisory Opinions 2004-02 & 1999-14.  Thus, the LNC can only accept annual distributions from Burrington's gift at the maximum threshold set by 2 U.S.C. §§ 441a(a)(1) & 441a(c), rather than accepting the gift all at once.  (Dkt. No. 13, ¶ 15).  The LNC objects to the statutory framework preventing the organization from receiving all of the

---

[1]     The amount is adjusted for inflation in odd-numbered years.  See 2 U.S.C. § 441a(c)(1); Federal Election Commission: Contribution Limits 2013-14, http://www.fec.gov/pages/brochures/contriblimits.shtml (last visited March 18, 2013).

money in one lump sum on the grounds that the framework "violates the First Amendment speech and associational rights of the LNC and its supporters." (Id. ¶ 23).

The LNC's First Amended Complaint "seeks to enjoin application of the Party Limit to the contribution, solicitation, acceptance, and spending of decedents' bequests, as said application violates the LNC's First Amendment speech and associational rights and those of its supporters." (Id. ¶ 3). It has moved this Court, pursuant to 2 U.S.C. § 437h, to certify the following question to the en banc Court of Appeals:

> Does imposing annual contribution limits against testamentary bequests directed at, or accepted or solicited by political party committees, violate First Amendment speech and associational rights?

(Dkt. No. 25). The FEC requested that the parties first create a factual record "to determine which constitutional claims, if any, merit certification to the Court of Appeals." (Dkt. No. 15, ¶ 6). The parties completed discovery in February 2012. (See Minute Order, Feb. 10, 2012). The LNC filed its Motion to Certify on May 4, 2012. (Dkt. No. 25). The FEC opposed that Motion, and filed a Motion for Summary Judgment, on July 6, 2012. (See Dkt. Nos. 28 & 29).

At the conclusion of discovery in this case, the parties submitted proposed findings of fact. LNC objects to many of the FEC's facts, claiming they improperly quote previous Supreme Court opinions and are thus not "facts" at all, present inadmissible hearsay, or both. (See Dkt. No. 30, at 2-3). The FEC responds by claiming that the facts the LNC objects to are legislative facts, which are "not subject to the Federal Rules of Evidence." (Dkt. No. 37, at 1). Legislative facts are "general facts which help the tribunal decide questions of law and policy," Friends of the Earth v. Reilly, 966 F.2d 690, 694 (D.C. Cir. 1992) (internal quotation marks omitted), are "without reference to specific parties," and "need not be developed through evidentiary hearings," Ass'n of Nat'l Advertisers, Inc. v. FTC, 627 F.2d 1151, 1161-62 (D.C. Cir. 1979). LNC also claims the FEC's objections to certain facts are obfuscatory because they purport to

present objections when they often merely restate the facts with different language.  (See, e.g., Dkt. No. 36, at 6 ("This is not an objection—it is an admission rephrasing the proposed fact.")). The Court overrules the LNC's hearsay objections for the reasons set forth by the FEC; however, because the Court will narrow the issue as described infra, many of the facts proffered by the parties are no longer relevant.

## II.    Legal Framework

### A.    Campaign Finance Law

As is well known, our Bill of Rights states that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. CONST. amend. I.  And "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806, 2817 (2011) (internal quotation marks and citations omitted).  But, of course, this does not end this matter, because Congress has passed, and the Supreme Court has upheld, laws that purport to limit speech— particularly in the manner of campaign contributions.  They have done so in part to prevent corruption, or the appearance of corruption.  A brief overview of the state of the law regarding campaign finance is warranted.  This will look at the current state of affairs with a particular focus on the law with respect to campaign contributions—what is at issue in this litigation—and will address campaign expenditures only in passing.

The first law limiting the unrestricted flow of money into politics came more than 100 years ago.  See McConnell v. FEC, 540 U.S. 93, 115 (2003) (discussing history, including passage of the Tillman Act in 1907), overruled in part on other grounds by Citizens United v. FEC, 558 U.S. 310 (2010).  But the bedrock case regarding limits on contributions related to

political efforts remains <u>Buckley v. Valeo</u>, 424 U.S. 1 (1976) (per curiam).[2]  <u>Buckley</u> involved a

challenge to the constitutionality of the 1974 FECA amendments, as well as related provisions of

the Tax Code.  <u>Id.</u> at 6.  The case dealt with contributions, expenditures, and reporting

requirements; this analysis will focus on only the first of those three.  The Supreme Court did not

hold contribution limits to the same constitutional scrutiny as expenditure limits, stating that "a

limitation upon the amount that any one person or group may contribute to a candidate or

political committee entails only a marginal restriction upon the contributor's ability to engage in

free communication."  <u>Id.</u> at 20.  This is so because a contribution limitation "involves little

direct restraint on [one's] political communication, for it permits the symbolic expression of

support evidenced by a contribution but does not in any way infringe the contributor's freedom

to discuss candidates and issues."  <u>Id.</u> at 21.  Ultimately, the Supreme Court concluded that the

FECA's limits on contributions withstood a facial constitutional challenge.  "Congress was

surely entitled to conclude . . . that contribution ceilings were a necessary legislative concomitant

to deal with the reality or appearance of corruption inherent in a system permitting unlimited

financial contributions, even when the identities of the contributors and the amounts of their

contributions are fully disclosed."  <u>Id.</u> at 28.

The <u>Buckley</u> Court considered whether limiting contributions would make it more

difficult for minor parties to amass sufficient funds.  They concluded that contribution limits

"would appear to benefit minor-party and independent candidates relative to their major-party

opponents because major-party candidates receive far more money in large contributions."  <u>Id.</u> at

33.  And in addressing an overbreadth challenge to contribution limits, namely the proposition

that most large contributors do not seek improper influence, the Court agreed with that

proposition generally, but nonetheless stated that because of the difficulty in determining suspect

---

[2]  The Libertarian Party was one of many plaintiffs in <u>Buckley</u>.  <u>See</u> 424 U.S. at 8.

contributions, "Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." Id. at 30.  In sum, "[i]t has . . . been plain ever since Buckley that contribution limits would more readily clear the hurdles before them" than expenditure limits.  Nixon v. Shrink Mo. Gov't PAC, 528 U.S 377, 387 (2000) (citation omitted).

Following Buckley, challenges to contribution limits continued to reach the Supreme Court in various forms.  In California Medical Ass'n v. FEC, 453 U.S. 182 (1981), appellants challenged the constitutionality of limits on contributions to multicandidate political action committees, and the court found no First Amendment violation to the rights of contributors.  Id. at 184-85.  A state campaign finance law was challenged in Shrink Missouri Gov't PAC, and the Court upheld its contribution limits to candidates, finding that a contribution limit has prevented effective advocacy only where it was "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless."  528 U.S. at 397

Then came McConnell, which, among other issues, addressed challenges to limits on "soft money" contributions to national political parties.[3]  Previously under the FECA, there existed a significant difference between so-called "hard" and "soft" money contributions.  The FECA limited hard money contributions, i.e., contributions to national parties for the purpose of influencing a federal election, but did not limit soft money contributions, i.e., money for other purposes, including "influencing state or local elections."  See McConnell, 540 U.S. at 122-23.  Donors who gave enough soft money often received special, preferential access to party leaders and elected officials.  See id. at 130 & n.30, 151-52 (describing access to Democratic and

---

[3]      The LNC was one of many plaintiffs in McConnell.  See 540 U.S. at 159.

Republican leaders).  After reviewing the record, the Supreme Court found that "[t]he idea that large contributions to a national party can corrupt or, at the very least, create the appearance of corruption of federal candidates and officeholders is neither novel nor implausible."  Id. at 144.

Seeking to "plug the soft-money loophole," Congress passed the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. 107-155, 116 Stat. 81, adding, among other provisions, 2 U.S.C. § 441i(a) to FECA, which "prohibits national party committees and their agents from soliciting, receiving, directing, or spending any soft money."  McConnell, 540 U.S. at 133 (citing 2 U.S.C. § 441i(a)).  Parties brought a facial First Amendment challenge to the new FECA § 441i(a), "as well as challenges based on the Elections Clause, U.S. Const., Art. I, § 4, principles of federalism, and the equal protection component of the Due Process Clause."  540 U.S. at 134. None of these challenges were successful.  The McConnell Court found that national parties "sell access to federal officeholders in exchange for soft-money contributions that the party can then use for its own purposes."  Id. at 155.  When reviewing the BCRA's ban on large soft money contributions to national party committees, the Supreme Court stated that "common sense" along with the ample record "confirm[ed]" that soft money contributions "have a corrupting influence or give rise to the appearance of corruption."  Id. at 145.  The Court did so using "[t]he less rigorous standard of review we have applied to contribution limits (Buckley's 'closely drawn' scrutiny) . . . ."  Id. at 137.  But the Court presciently concluded:  "We are under no illusion that BCRA will be the last congressional statement on the matter.  Money, like water, will always find an outlet."  Id. at 224.

In Randall v. Sorrell, 548 U.S. 230 (2006), the Supreme Court (in a plurality opinion) struck down the contribution limits found in a Vermont statute.  Vermont imposed strict limits on the amount individuals, political parties, and political committees could contribute to candidates

for state office.  For example, the cap for governor, lieutenant governor, and other statewide offices was $400, and was not indexed for inflation.  <u>See</u> 548 U.S. at 238.  The Supreme Court described the test for determining whether the Vermont statute satisfied constitutional scrutiny as whether the statute's "contribution limits prevent candidates from amassing the resources necessary for effective [campaign] advocacy, whether they magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage; in a word, whether they are too low and too strict to survive First Amendment scrutiny." <u>Id.</u> at 248 (citation and internal quotation marks omitted).  The plurality opinion concluded that the Vermont statute was unconstitutional because it "would reduce the voice of political parties in Vermont to a whisper." <u>Id.</u> at 259 (citation and internal quotation marks omitted).

In 2010, <u>Citizens United</u> overruled previous Supreme Court precedent and no doubt is a historic opinion, but generally the case is not about contribution limits.  At issue was a ban on independent corporate expenditures, which the Court struck down because it found that "independent expenditures do not lead to, or create the appearance of, <u>quid</u> <u>pro</u> <u>quo</u> corruption." 130 S. Ct. at 910.  The <u>Citizens United</u> Court did not "reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny." <u>Id.</u> at 909.  The Court did note, however, that "[t]he fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt." <u>Id.</u> at 910.

Two months after <u>Citizens United</u>, together our District and Circuit courts issued two election law cases on the same day.  In <u>Speechnow.org v. FEC</u>, 599 F.3d 686 (D.C. Cir. 2010) (en banc), the nonprofit organization Speechnow.org availed itself of 2 U.S.C. § 437h on five constitutional questions, three related to contribution limits.  Because Speechnow.org planned to "operate exclusively through independent expenditures . . . not made in concert or cooperation

with . . . a political party committee or its agents," 599 F.3d at 689 (internal quotation marks and citations omitted), the questions related to whether the contribution limits in 2 U.S.C. § 441a(a) violated the First Amendment as applied to the organization, see id. at 690-91.  The court's decision in Speechnow.org was "[i]n accordance with" Citizens United, 599 F.3d at 689, because that "Court held that the government has no anti-corruption interest in limiting independent expenditures.  Of course, the government still has an interest in preventing quid pro quo corruption.  However, after Citizens United, independent expenditures do not implicate that interest." Id. at 693 & n.3 (emphasis in original).  Thus, the court ultimately concluded that limiting contributions by individuals to political committees that made only independent expenditures violated the First Amendment. Id. at 696.

In Republican Nat'l Comm. v. FEC, 698 F. Supp. 2d 150 (D.D.C.) (three-judge court), aff'd 130 S. Ct. 3544 (2010), several entities brought an as-applied challenge to the BCRA regarding limits on contributions to political parties, claiming the First Amendment entitled them to raise and spend soft money for various activities that "lack sufficient connection to a federal election." Id. at 155 (citation omitted) (emphasis in original).  The parties submitted affidavits stating they would not, among other things, offer any access to federal candidates or officeholders to soft money donors. Id.  As to the standard to apply, the Court affirmed that "closely drawn" scrutiny applies to contribution limits rather than strict scrutiny. Id. at 156 (citing McConnell, 540 U.S. at 138-41).  In its analysis, the Court noted that "Citizens United did not disturb McConnell's holding with respect to the constitutionality of BCRA's limits on contributions to political parties." Id. at 153 (citation omitted).  The Court stated that the parties were "asking us to overrule McConnell's holding with respect to the ban on soft-money contributions to national political parties.  As a lower court, we of course have no authority to do

so."  Id. at 157.   And regarding the facial versus as-applied distinction, the Court stated:  "In general, a plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the Supreme Court expressly considered when rejecting a facial challenge to that provision.  Doing so is not so much an as-applied challenge as it is an argument for overruling a precedent."  Id.

Most recently, on February 19, 2013, the Supreme Court noted probable jurisdiction in McCutcheon v. FEC, Civil Action No. 12-cv-1034 (JEB)(JRB)(RLW),  2012 WL 4466482 (D.D.C. Sept. 28, 2012) (three-judge court).   See  http://www.supremecourt.gov/qp/12-00536qp.pdf.  In McCutcheon, a three-judge panel found FECA's aggregate contribution limits constitutional.  That panel concluded:  "Plaintiffs raise the troubling possibility that Citizens United undermined the entire contribution limits scheme, but whether that case will ultimately spur a new evaluation of Buckley is a question for the Supreme Court, not us."  McCutcheon, 2012 WL 4466482, at *7.  This Court ordered the parties to submit their positions on "whether the Supreme Court's decision regarding McCutcheon v. FEC should impact further proceedings in this case."  Minute Order, Feb. 21, 2013.  The parties stated that they "agree that the Supreme Court's action in McCutcheon should not delay this Court's consideration of the LNC's pending motion for certification pursuant to 2 U.S.C. § 437h and the Commission's pending motion for summary judgment."  (Dkt. No. 39, at 1).

## B.    FECA Motion to Certify

The FECA provides at 2 U.S.C. § 437h that:

> The [Federal Election] Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act.  The district court immediately shall certify all questions of

> constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

The provision was introduced by Senator Buckley himself. He stated:

> It merely provides for expeditious review of the constitutional questions I have raised. I am sure we will all agree that if, in fact, there is a serious question as to the constitutionality of this legislation, it is in the interest of everyone to have the question determined by the Supreme Court at the earliest possible time.

120 CONG. REC. 10562 (1974). The only person in the House of Representatives who appears to have commented on 2 U.S.C. § 437h was Representative Frenzel, who stated:

> I believe within this conference report there are at least 100 items questionable from a constitutional standpoint . . . . I do call attention . . . to the fact that any individual under this bill has a direct method to raise these questions and to have those considered as quickly as possible by the Supreme Court.

120 CONG. REC. 35140 (1974).

"Although the language of the statute requires the district court to certify <u>all</u> constitutional questions, courts have held that this mandatory phrasing should not be read to require them automatically to certify every constitutional question to an en banc court of appeals." <u>Goland v. United States</u>, 903 F.2d 1247, 1257 (9th Cir. 1990) (emphasis in original). Section 437h "cannot properly be used to compel federal courts to decide constitutional challenges in cases where the resolution of unsettled questions of statutory interpretation may remove the need for constitutional adjudication," <u>Cal. Med. Ass'n</u>, 453 U.S. at 192 n.14 (citations omitted), and does not require certification of "frivolous" or "settled principles of law," <u>Khachaturian v. FEC</u>, 980 F.2d 330, 331 (5th Cir. 1992) (citing <u>Cal. Med. Ass'n</u>, 453 U.S. at 192 n.14). In <u>Cal. Med. Ass'n</u>, Justice Marshall describes the categories of cases that merit 2 U.S.C. § 437h certification as those that are "neither insubstantial nor settled," 453 U.S. at 192 n.14— suggesting that, in the context of 2 U.S.C. § 437h, "frivolous" and "insubstantial" have the same

meaning.  See also Mott v. FEC, 494 F. Supp. 131, 134 (D.D.C. 1980) (stating a district court

"may initially review a complaint to determine if it presents a ripe and substantial constitutional

controversy before certifying the questions to the en banc court of appeals") (footnote omitted)

(emphasis added).

    The Goland case offers the following perspective on certification:

> Once a core provision of FECA has been reviewed and approved by the
> courts, unanticipated variations also may deserve the full attention of the
> appellate court.  At the same time, not every sophistic twist that arguably
> presents a "new" question should be certified.  Once the statute has been
> thoroughly reviewed by the Court, questions arising under "blessed"
> provisions understandably should meet a higher threshold.

903 F.2d at 1257.  In addition, the Supreme Court has stated that 2 U.S.C. § 437h should be

construed narrowly, in part because it creates "a class of cases that command the immediate

attention of . . . the courts of appeals sitting en banc, displacing existing caseloads and calling

court of appeals judges away from their normal duties for expedited en banc sittings."  Bread

Political Action Comm. v. FEC, 455 U.S. 577, 580 (1982).  Goland stated that the standard is

"similar to that of a single judge presented with a motion to convene a three judge court to hear

constitutional challenges. . . .  Such a standard may more closely resemble that applied under

Rule 12(b)(6) . . . ."  903 F.2d at 1257-58 (citing Mott, 494 F. Supp. 131 & Clark v. Valeo, 559

F.2d 642 (D.C. Cir.), aff'd 431 U.S. 950 (1977)).  The standard was recently articulated as

"somewhere between a motion to dismiss—where no factual review is appropriate—and a

motion for summary judgment—where the Court must review for genuine issues of material

fact." Cao v. FEC, 688 F. Supp. 2d 498, 503 (E.D. La. 2010), aff'd sub nom. In re Cao, 619 F.3d

410 (5th Cir. 2010).  "[S]ome review of the facts is inherently necessary to determine if a

colorable claim has been raised."  Id. at 502.  "[I]t follows that any question that the Court finds

'frivolous' is also appropriate for summary judgment."  Id. at 503.  A court can grant summary

judgment, of course, when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## III.    Analysis

### A.    Standing

As an initial matter, this Court must determine whether the LNC has standing to assert the rights, if any, of Burrington's estate.  Although the parties did not fully address the issue in their briefs, the Court has an obligation to confirm its own jurisdiction, and the D.C. Circuit has instructed that "[w]hen there is doubt about a party's constitutional standing, the court must resolve the doubt, sua sponte if need be."  Lee's Summit, Mo. v. Surface Transp. Bd., 231 F.3d 39, 41 (D.C. Cir. 2000) (citations omitted).  Indeed, where the Court has doubts about a party's standing, it is reversible error to simply bypass the issue of standing and to proceed to the merits of the case, even "where the merits question may be easily answered."  Dominguez v. UAL Corp., 666 F.3d 1359, 1361-62 (D.C. Cir. 2012).

The D.C. Circuit has construed 2 U.S.C. § 437h to allow a plaintiff to bring a challenge on behalf of others, provided they fall within the terms of the statute and satisfy the requirements of Article III standing.  In International Ass'n of Machinists & Aerospace Workers v. FEC, 678 F.2d 1092 (D.C. Cir. 1982) (en banc), aff'd 459 U.S. 983 (1982), the FEC argued that standing was "confined to plaintiffs who put in issue their First Amendment rights qua voters."  678 F.2d at 1098.  Calling this a "pinched" construction of § 437h, the D.C. Circuit rejected a reading of the statute that would only allow voters to raise constitutional issues in relation to their rights as voters.  Id.  As a result, the court in Int'l Ass'n of Machinists found standing for plaintiffs to bring a constitutional challenge "vicariously" to a FECA provision that permitted corporate PACs to solicit contributions from career employees of the corporation, even though none of the

plaintiffs were career employees covered by the provision.  See id. at 1099.  "Congress can authorize any plaintiff who meets the Article III tests of injury to assert the rights of others, since the general rule against asserting the rights of others is simply a prudential rule."  13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531.9.3 n.103 (3d ed. 2008) (citing Int'l Ass'n of Machinists).

As a result, this Court concludes that the LNC has standing.  The LNC satisfies the core elements of Article III's case-or-controversy requirement, because it alleges an injury connected to the FEC's conduct—the prevention of obtaining immediate control of the entire Burrington bequest—that would be redressed by a favorable decision.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  The relevant statute here, 2 U.S.C. § 437h, grants national political committees such as LNC the right to bring an action "to construe the constitutionality of any provision of this Act."  Following Int'l Ass'n of Machinists, the LNC can challenge this provision and assert the First Amendment interests of Burrington or others to support its claim.

**B.      Proper Level of Constitutional Scrutiny**

The Supreme Court has consistently held that contribution limits should be subject to constitutional scrutiny that is less rigorous than the strict scrutiny applied to expenditure limits.  And the FEC has consistently held that testamentary bequests are subject to the limits in 2 U.S.C. § 441a(a)(1).  The LNC has not presented a convincing reason to stray from this precedent.

**1.      Strict versus Intermediate scrutiny**

Contribution limits and expenditure limits receive different constitutional scrutiny.  It is "simply untrue in the campaign finance context that all burdens on speech necessitate strict scrutiny review."  McConnell, 540 U.S. at 140 n.42 (citation and quotation marks omitted).  "Under the Supreme Court's precedents, limits on campaign expenditures are subject to strict

scrutiny.   But limits on <u>contributions</u> to candidates and political parties are subject to 'less rigorous scrutiny' and are valid if they are 'closely drawn' to meet a 'sufficiently important' governmental interest." <u>Republican Nat'l Comm. v. FEC</u>, 698 F. Supp. 2d at 156 (emphasis in original).  The "closely drawn" standard has been described as intermediate scrutiny.  <u>See</u> <u>In re Cao</u>, 619 F.3d 410, 427 (5th Cir. 2010).

Though courts have consistently held that the standard to apply to contribution limits is akin to intermediate scrutiny, <u>see</u>, <u>e.g.</u>, <u>Speechnow.org</u>, 599 F.3d at 692, and <u>Republican Nat'l Comm. v. FEC</u>, 698 F. Supp. 2d at 156, the LNC argues that they have done so only with respect to the rights of the living, and this conclusion should not apply to contribution limits related to bequests, which should receive strict scrutiny.   Nowhere in any opinion has the Court ever suggested that certain contributions should receive a different level of scrutiny than others, and this Court is bound by the uninterrupted, decades-long precedent of the Supreme Court.  For that reason, the level of scrutiny at issue here should be, as it has been to all cases involving contribution limits since <u>Buckley</u>, intermediate scrutiny.

### 2.        FEC interpretation of "person" in 2 U.S.C. § 441a(a)(1)

In 1983, the FEC issued an Advisory Opinion to the National Maritime Union Political and Legislative Organization on Watch.  FEC Advisory Op. 1983-13.  The organization received money from an estate beyond what they could accept in a single year.  They proposed to accept the full gift, withdraw an amount under the legal limit annually, and maintain the balance in a special escrow account that would be maintained in their name as a separate bank account.  The FEC issued an Opinion stating that "given the absence of any specific prohibition in the Act as regards contributions from a decedent's estate (pursuant to a specific testamentary bequest), and given the expansive definition of the term 'person' which, in turn, determines the applicability of

the monetary limits in 2 U.S.C. 441a(a)(1), the Commission concludes that specific testamentary bequests to a political committee are contributions when distributed by the decedent's estate and are subject to the limits of 441a(a)(1)."  (Dkt. No. 25-10 (FEC Advisory Op. 1983-13), at 2). "[T]he Commission views the testamentary estate of a decedent as the successor legal entity to the testator and thus will apply the Act and its limits as the <u>alter ego</u> of the living testator."  (<u>Id.</u>).

In 1999, the FEC issued an Advisory Opinion to the Council for a Livable World.  FEC Advisory Op. 1999-14.  Here the FEC determined that if a testamentary gift in excess of an annual limit is placed in a political committee's escrow account that it can control, it is unlawful under the FECA.  "[T]he Commission has concluded, in previous opinions, that a testamentary estate is the successor legal entity to the testator and qualifies as a person under the Act that would be subject to the same limitations and prohibitions applicable to the decedent in the decedent's lifetime.  Advisory Opinions 1988-8, 1986-24, and 1983-13."  (Dkt. No. 25-7 (FEC Advisory Op. 1999-14), at 2).  This Opinion superseded earlier opinions to the extent that a political committee could no longer exercise control over all funds from a bequest, such as deciding to withdraw less than the maximum annual contribution one year as part of an investment strategy.

In 2004, the FEC issued an Advisory Opinion to the National Committee for an Effective Congress ("NCEC").  FEC Advisory Op. 2004-02.  The NCEC wanted to accept funds from testamentary trusts beyond their control.  The FEC reiterated that "the Commission has concluded that the testamentary estate of a decedent is the successor legal entity to the testator and qualifies as a 'person' under the Act that is subject to the same limitations and prohibitions applicable to the decedent in the decedent's lifetime."  (Dkt. No. 25-6 (FEC Advisory Op. 2004-02), at 3 (citing FEC Advisory Op. 1999-14)).  The FEC noted that a contribution is made "when

16

the contributor relinquishes control over the contribution," and that occurs when the contribution "is delivered by the contributor to the . . . political committee."  11 C.F.R. § 110.1(b)(6). Because the NCEC would be accepting contributions from testamentary trusts beyond their control, the FEC stated that they may accept the contributions, so long as they did not exceed the applicable annual limits.

The FEC's interpretation of the statute to include a testamentary bequest appears reasonable, is not seriously challenged by the LNC in its briefs, and is entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc. 467 U.S. 837 (1984).  FECA states that "[t]he term 'person' includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term does not include the Federal Government or any authority of the Federal Government."  2 U.S.C. § 431(11).  The FEC's interpretation that a decedent's estate qualifies as a person follows logically from the basic tools of statutory interpretation.  Under the canon of expressio unius est exclusio alterius,[4] items not listed are assumed to be covered by the statute.  Here Congress specifically excluded certain categories from the definition of person.  It did not exclude a decedent's estate.  This indicates that a decedent's estate should be understood as included in the term "person."  In addition, the statute lists what the term person "includes," and thus that list is meant to be expansive.  This too accords with an understanding that "person" includes a decedent's estate.

*   *   *   *   *

With the understanding that the challenge brought here by the LNC is to be considered under intermediate scrutiny, and that the FEC's interpretation that testamentary bequests are

---

[4]      While our Circuit has cautioned this canon "is not always correct," see, e.g., Public Citizen, Inc. v. Rubber Manufacturers Ass'n, 533 F.3d 810, 817 (D.C. Cir. 2008) (citation omitted), the LNC has not presented a valid argument for ignoring the rule in this case.

considered persons under the FECA is reasonable, this Court now turns to the question presented for certification.

### C.       The Question as Framed is Frivolous and/or Insubstantial

#### 1.       The question as presented goes beyond a proper as-applied challenge

The LNC cannot bring a facial challenge regarding contribution limits, but instead must bring an as-applied challenge.   The Supreme Court upheld contribution limits to a facial challenge nearly forty years ago in <u>Buckley</u>, and that ruling remains good law.  In addition, that Court noted that "any attempt to exclude minor parties and independents en masse from the Act's contribution limitations overlooks the fact that minor-party candidates may win elective office or have a substantial impact on the outcome of an election."  <u>Buckley</u>, 424 U.S. at 34-35. Furthermore, it is "reasonable to require that all parties and all candidates follow the same set of rules designed to protect the integrity of the electoral process." <u>McConnell</u>, 540 U.S. at 159. Therefore a facial challenge to contribution limits must fail.   But, the Supreme Court has reaffirmed that "a nascent or struggling minor party can bring an as-applied challenge if [Section 441i(a)] prevents it from 'amassing the resources necessary for effective advocacy.'" <u>McConnell</u>, 540 U.S. at 159 (quoting <u>Buckley</u>, 424 U.S. at 21).  Thus the LNC, as a so-called minor party, can bring an as-applied challenge, but that ability is not without limits.

The as-applied challenge the LNC seeks to bring here is not proper because the relief sought would not apply solely to themselves, but would extend to other entities not before this Court.  In this case, the question presented by the LNC challenges the constitutionality of FECA as applied to <u>all</u> bequests to <u>all</u> national political parties, not just the constitutionality of FECA as applied to the Burrington bequest to the LNC.  Although an as-applied challenge can sometimes raise issues beyond those immediately faced by the parties to a suit, the Supreme Court has

repeatedly cautioned that, in campaign finance cases in particular, it may not be appropriate to decide an as-applied challenge based on facts not before the court.  For example, in <u>FEC v. Wisconsin Right to Life</u>, 551 U.S. 449, 481 n.10 (2007) (opinion of C.J. Roberts & J. Alito), the Supreme Court refused to "pass on" an argument in an as-applied challenge because it was not applicable to the plaintiff's factual circumstances.  Similarly, in <u>Cal. Med. Ass'n</u>, 453 U.S. at 197 n.17, the Supreme Court refused to consider a "hypothetical application of the [Federal Election Campaign] Act" that raised First Amendment concerns not present in the as-applied challenge made by the California Medical Association.  <u>See also</u> <u>FEC v. Nat'l Right to Work Comm.</u>, 459 U.S. 197, 208 (1982) (focusing on whether the FECA was sufficiently tailored to the "associational interests asserted by respondent").  <u>Cf.</u> <u>United States v. Raines</u>, 362 U.S. 17, 22 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases . . . .").  The question the LNC has moved to certify is not simply about the Burrington bequest, but about all bequests to all political parties, and if certified, the question would confront the en banc Court of Appeals with hypothetical questions about parties not involved in this litigation.  This Court must respect the caution counseled by the Supreme Court in as-applied campaign finance cases as a result.

Further, the as-applied challenge brought by the LNC in this case is impermissible because it raises issues that the Supreme Court has already addressed.  "In general, a plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the Supreme Court expressly considered when rejecting a facial challenge to that provision.  Doing so is not so much an as-applied challenge as it is an argument for overruling a precedent."  <u>Republican Nat'l Comm. v. FEC</u>, 698 F. Supp. 2d at 157.  Here, the LNC challenges FECA as unconstitutional as applied to <u>all</u> bequests, not just the Burrington

bequest.  But bequests other than Burrington's may very well raise the anti-corruption concerns that motivated the <u>Buckley</u> and <u>McConnell</u> Courts to dismiss a facial attack on contribution limits.

The LNC concedes that it is possible for a bequest to raise valid anti-corruption concerns, such as a "testamentary <u>quid</u> <u>pro</u> <u>quo</u> . . . soliciting a bequest from a terminally-ill individual." (Dkt. No. 25-1, at 27).   Nonetheless, the LNC argues that "[t]he anti-corruption rationale for limiting contributions [from bequests] is, at best, theoretical . . . ." (Dkt. No. 25-1, at 21).  But making one's bequest known before death could be treated just as a contribution is, as suggested by how other groups treat such bequests.  (<u>See</u> Dkt. No. 24, ¶¶ 112-14, discussing the National Rifle Association, Nature Conservancy, and Kennedy Center).  A bequest may also help friends or family of the deceased have access to political officeholders and candidates.  For example, the LNC's Rule 30(b)(6) witness in this case, William Redpath, testified that after Joseph A. Reitano left the LNC a $19,331.40 bequest, his son could have been allowed to become a member of the LNC's Chairman's Circle in his father's place.  (<u>See</u> Dkt. Nos. 24 & 30, ¶ 122).  The FEC states that testators have already noted in bequests what specific candidates should benefit, and also that an estate trustee has contacted the Democratic National Committee about a $200,000 bequest to ask that it be used to defeat a particular candidate.  (Dkt. No. 28, at 35).  Thus the agency's argument that political committees could offer access to the donor's heirs or representatives upon the production of a generous will, or that a political committee could feel pressure to continue to ensure that a (potential) donor is happy with the committee's actions lest they revoke the bequest, is sensible and persuasive.  (<u>See</u> Dkt. No. 28, at 36).

That there is not a record replete with well-documented problems associated with corruption from large bequests is a red herring.  The LNC complains that the FEC is only

pointing to hypotheticals, but the agency cannot point to examples of corruption or the appearance of corruption from bequests to political committees in large part because the FECA contribution limit has applied to them for the last 35 years.  (See Dkt. No. 38, at 15).  The LNC argues that because testators are "not alive to receive the benefits of a quid pro quo," "[t]his distinction is substantial enough that the Commission's comparison to soft money is inappropriate, and its motion for summary judgment must be denied."  (Dkt. No. 34, at 26).  The LNC seems to be suggesting that, since the FEC lacks a significant set of examples other than the many examples of the problems that led to the FECA and BCRA, they should allow unlimited bequests, see if this too leads to an intolerable situation, and only then ban this form of unlimited contributions.  (Id. at 9 (arguing that the "issue posed by this case is whether bequests are, or are not, as likely as individual contributions to lead to corruption or its appearance") (emphasis added)).  The Supreme Court has already closed this door in Buckley, McConnell, and other cases by rejecting facial attacks to contribution limits using intermediate scrutiny.  By making their donation known while alive, testators could command and demand access.  The scope of the "pernicious practices" involved in large direct contributions to political committees "can never be reliably ascertained."  Citizens United, 130 S. Ct. at 908 (quoting Buckley).  That is why the Supreme Court has upheld contribution limits:  they are "preventative."  Id.  This indicates it should be the same for bequests as for other contributions.

As the FEC points out, the LNC seeks to eliminate the restrictions on all bequests to all political parties, not just to smaller parties such as the LNC.  (See Dkt. No. 38, at 13 n.5).  Even assuming that the limit on bequests unconstitutionally harms struggling minor parties, as the LNC claims, the LNC has not sought relief solely on behalf of struggling minor parties.  Rather, the question they have proposed for certification is far broader, and purports to seek relief on

behalf of all parties.  Thus, the arguments about the effect of FECA limits on the LNC's ability to express its message as a struggling minor party or to engage in effective advocacy, even if credited, do not support the claim as articulated, which seeks relief on behalf of all national parties and all bequests.  It is not for this Court to certify to the en banc Court of Appeals an as-applied question laden with hypotheticals about the constitutionality of contribution limits under FECA, especially when the Supreme Court has already addressed parts of the question in a facial challenge.

2.      **The question as presented includes an issue mooted by the briefs**

Another reason that certifying the question as drafted by the LNC would not be appropriate is that the issue of solicitation was mooted in part by the parties' briefs.  LNC argued that because it could not solicit bequests over the maximum even if they were parsed out annually at the legal limit, this too violated the First Amendment.  (Dkt. No. 13, ¶ 25).  The relevant FECA provision, 2 U.S.C. § 441i(a)(1), states that a party "may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act."  The FEC denies that this provision forbids national political parties from soliciting a bequest that exceeds FECA's annual limits, provided they "accept[] or receive[] funds from that bequest only in amounts that comply with FECA's annual contribution limits and in a manner consistent with the Commission's relevant regulations and advisory opinions." (Dkt. No. 15, ¶ 2).  The LNC argues that because the statutory language is "<u>are</u> not subject" rather than "<u>would not be</u> subject," the FEC is wrong, but the LNC agrees that because of the agency's concession, "that is a matter for another day."  (Dkt. No. 25-1, at 12-13) (emphasis in original).  But were this Court to certify the question as drafted, despite the LNC's seeming

acknowledgement that at least part of the solicitation issue is no longer in dispute, the Court of Appeals would be tasked with answering the question anyway. This would be a further abdication of this Court's responsibility, as explained further below

### D. Role of the District Court to Reframe the Question

Several times during oral argument on the parties' pending motions, the Court inquired of the parties about the role of this Court, if any, in amending the question presented by the LNC. The Court asked counsel for the LNC if the issue was "all or nothing," meaning are there only two choices—to certify the question as presented, or grant FEC's summary judgment motion. Counsel responded: "That's a difficult thing for me to answer, Your Honor, as I'm sure you're aware." (Tr. 28:5-6). He later added "it may be within Your Honor's power to rewrite things. I'm not aware of a precedent on that . . . ." (Tr. 31:7-8). And when asked whether this Court had the authority to amend the question, counsel for LNC responded: "I don't have a position on Your Honor's authority to modify the question." (Tr. 32:9-13). Counsel for the FEC, when asked about the same issue, stated that amending the question was in the Court's discretion, (Tr. 58:6-8), adding, "I don't know that there's anything wrong with that . . . ." (Tr. 60:4).

The Court researched this issue following argument, and it appears that longstanding precedent supports this Court's discretion in crafting and/or amending any questions certified to the Court of Appeals. Before <u>Buckley</u> reached the Supreme Court, District Judge Howard Corcoran of this court transmitted the entire case to the en banc Court of Appeals. <u>Buckley v. Valeo</u>, 387 F. Supp. 135 (D.D.C. 1975). The Court of Appeals remanded the case to Judge Corcoran to (1) "[i]dentify constitutional issues in the complaint," (2) take evidence, (3) make findings of fact, and "[c]ertify to [the D.C. Circuit Court of Appeals] constitutional questions arising from steps 1, 2, and 3." <u>Buckley v. Valeo</u>, 519 F.2d 817, 818 (D.C. Cir. 1975) (en banc).

The Court of Appeals later described Judge Corcoran's role as taking part in "the <u>formulation</u> of constitutional questions to be certified" to it.  <u>Buckley v. Valeo</u>, 519 F.2d 821, 835 (D.C. Cir. 1975) (en banc) (emphasis added).  Because the Court of Appeals instructed Judge Corcoran to identify questions, and affirmed his role in <u>formulating</u> those questions, <u>Buckley</u>'s history strongly suggests the District Court has an active, rather than passive, role in the certification process under 2 U.S.C. § 437h.

The role of the district court in formulating the constitutional questions certified pursuant to Section 437h has been affirmed and endorsed by several other courts as well.  In <u>Bread Political Action Committee v. FEC</u>, 635 F.2d 621, 625 n.4 (7th Cir. 1980), the Seventh Circuit approved when "[t]he district court polished plaintiffs' draft questions into their present form."[5] In <u>Khachaturian v. FEC</u>, the Fifth Circuit described the role of the district court as follows:  "If it concludes that colorable constitutional issues are raised from the facts, it should certify those questions to us."  980 F.2d at 332 (citation omitted).  That court was even more explicit in a recent decision.  In <u>Cao v. FEC</u>, the district court "exercise[d] its discretion in fashioning a question for the Fifth Circuit that more precisely captures the Constitutional difficulty raised by the plaintiffs' arguments."[6]  688 F. Supp. 2d at 542.  The Fifth Circuit blessed Judge Berrigan's reformulation of questions offered by plaintiffs, referring to the district court as "abiding by its proper role in addressing a 2 U.S.C. § 437h challenge."  <u>In re Cao</u>, 619 F.3d at 414.[7]

---

[5]     The Court also notes that the Supreme Court in neither <u>Bread</u> nor <u>Buckley</u> took issue with the district court's role in drafting questions.

[6]     Judge Berrigan also altered another question offered by plaintiffs.  <u>See</u> <u>Cao v. FEC</u>, 688 F. Supp. 2d at 547-49.

[7]     Furthermore, in <u>Speechnow.org</u>, which counsel for LNC referred to as a "model" case at oral argument, (Tr. 23:25), it appears that Judge Robertson "polished" the questions, because certain questions proposed by plaintiffs differ from those actually certified by Judge Robertson to the Court of Appeals.  <u>Compare</u>, <u>e.g.</u>, Pls.' Mot. to Certify Questions Under 2 U.S.C. § 437h, Civil Action No. 08-0248 (JR), Dkt. No. 31, at 21 ("Whether the contribution limit <u>contained in</u> 2 U.S.C. § 441a(a)(1)(C) . . .") <u>with</u> <u>Speechnow.org v. FEC</u>, Civil Action No. 08-0248 (JR),

Therefore, even though the question as framed by the LNC does not merit certification, this does not end the matter.  This Court has the power, and apparently the duty, to identify the constitutional issues and to reframe the question as necessary so that any proper non-frivolous question is certified to the en banc Court of Appeals.  As discussed above, there is ample, uncontested precedent for doing so.  Therefore this Court now turns to whether it is proper to do so in this case.

E.      **Question to Certify**

Mr. Burrington is now deceased, so he currently cannot exercise any First Amendment right of association.  The LNC concedes that it does not knowingly "associate with the dead" and that Burrington's associational rights are not at issue.  (See Dkt. No. 25-1, at 14).  Thus, in the literal sense, the FECA restriction (as enforced by the FEC) on the Burrington bequest is not a "contribution limit involving significant interference with associational rights [that] must be closely drawn to serve a sufficiently important interest."   Speechnow.org, 599 F.3d at 692 (citation omitted).

The LNC's argument that Burrington's expressive rights are at issue is insubstantial.  For example, the LNC argues that a law review article by Professor David Horton "comprehensively—and compellingly—addressed" the issue of "testation's expressive aspects," suggesting the article reveals scholarly unanimity for the proposition that the Constitution limits testamentary freedom.  (Dkt. No. 34, at 19).  But the LNC neglects to note that Professor Horton acknowledges that "there has long been consensus that the Constitution does not apply to limits on testamentary freedom," and Professor Horton's article "challenge[s] the conventional wisdom and argue[s]" for a different view.  David Horton, Testation and Speech, 101 GEO. L.J. 61, 61, 90

_____

2009 WL 3101036, at *2 (D.D.C. Sept. 28, 2008) ("Whether the contribution limit mandated by 2 U.S.C. § 441a(a)(1)(C) . . .") (emphasis added).

(2012).  And while the LNC argues that <u>Hodel v. Irving</u>, 481 U.S. 704 (1987) makes it "clear [that] decedents have the constitutional right to devise property," (Dkt. No. 34, at 18), Professor Horton's article concedes that "scholars unanimously reached the same conclusion:  <u>Hodel</u> only bars the government from stripping owners of their ability to transmit an asset after death by any means . . . without providing just compensation," 101 GEO. L.J. at 89.  This Court agrees with Professor Horton's assessment of <u>Hodel</u>.  Given that the FEC is not taking one penny away from the LNC, any reliance on <u>Hodel</u> is misplaced.

Moreover, the authorities cited by the FEC confirm that Burrington's testamentary estate has no First Amendment rights.  <u>See</u>, <u>e.g.</u>, <u>United States v. Maciel-Alcala</u>, 612 F.3d 1092, 1098 (9th Cir. 2010) ("[O]ne cannot violate a deceased person's civil or constitutional rights.") (citation omitted); <u>Silkwood v. Kerr-McGee Corp.</u>, 637 F.2d 743, 749 (10th Cir. 1980) ("[T]he civil rights of a person cannot be violated once that person has died.") (citations omitted).  It is likely for these reasons that the LNC also seems to disclaim the argument that it is seeking to enforce the expressive rights of Burrington's estate.  As opposed to the broader question proposed in its motion for certification, the LNC argues in its Reply brief that the relevant question is whether <u>the</u> <u>LNC's</u> First Amendment rights have been violated.  (<u>See</u> Dkt. No. 34, at 7).

Thus, the LNC also argues that it has a First Amendment right to receive contributions, through bequests or otherwise.  The argument is based primarily on the case of <u>Dean v. Blumenthal</u>, 577 F.3d 60 (2d Cir. 2009).  In <u>Dean</u>, a candidate for Connecticut Attorney General challenged a prohibition on receiving campaign contributions from people employed at private law firms doing work for the state.  The Second Circuit stated that, during the relevant time period in that case, "it is clear that a constitutional right to receive campaign contributions was

not clearly established, but it is 'far from obvious whether in fact there is such a right.'" <u>Id.</u> at 68

(quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 237 (2009)).  Unlike the district court, which had

found such a right inconsistent with <u>Randall</u>, the Second Circuit stated:  "To the contrary,

although <u>Randall</u> did not recognize a First Amendment right to receive campaign contributions,

its analysis did not foreclose such recognition." <u>Dean</u>, 577 F.3d at 69 (citations omitted).  The

LNC argues that if such a right indeed exists, the FEC's restriction could not withstand "closely

drawn" scrutiny, or even rational basis scrutiny, because there is no potential for corruption or

the appearance of corruption with the Burrington bequest.  Before the bequest, the only known

interaction between Burrington and the LNC occurred in 1998 when the former donated $25.00

to the Libertarian Party.  Nothing indicates Burrington gave any money again during his life, and

the LNC had no idea that Burrington planned to leave any money to the organization in his will.

The LNC makes a persuasive argument that the Burrington bequest does not implicate any valid

anti-corruption concerns, and the FEC did not really respond to this argument in its briefs.

The Second Circuit in <u>Dean</u> did not view as frivolous the argument that there is a First

Amendment right to receive campaign contributions.  Neither should this Court.  Of course, even

if there is such a right, it is not absolute.  Congress, through FECA, can seek to prevent

corruption and the appearance of corruption, in part because "[l]arge contributions are intended

to, and do, gain access to the elected official after the campaign for consideration of the

contributor's particular concerns." <u>McConnell</u>, 540 U.S. at 119 n.5 (citation omitted).  And post-

BCRA, national political committees continue to solicit contributions in exchange for access.

(<u>See</u> Dkt. No. 24, ¶ 52).  However, here there are no facts to indicate that the LNC solicited a

large bequest from Burrington, provided any benefit or special access to Burrington while he was

alive, or provides any special benefit or access to Burrington's heirs or representatives now.  On

these facts, it appears that the anti-corruption interests that would be implicated by allowing the LNC to receive the entire bequest all at once may be minimal.[8]  Thus, the question of whether the FECA restriction on Burrington's bequest to the LNC violates the LNC's First Amendment right to receive campaign contributions is not insubstantial and can be certified to the en banc Circuit Court.  See Speechnow.org, 599 F.3d at 692 ("The Supreme Court has recognized only one interest sufficiently important to outweigh the First Amendment interests implicated by contributions for political speech:  preventing corruption or the appearance of corruption.") (citations omitted).

## CONCLUSION

After a careful review of the parties' positions, the facts, and the current state of the law in this area, this Court concludes that although the question presented by the LNC for certification does not merit review by the en banc Court of Appeals, there is a valid, narrower constitutional question raised by the Burrington bequest that presents an as-applied challenge that should be certified.  This Court does not relish requiring our Court of Appeals to sit en banc, but at the same time it has a duty under 2 U.S.C. § 437h to certify appropriate constitutional issues.  Accordingly, this Court has narrowed the question as initially drafted and presents only the following question for the D.C. Circuit's review:

> Does imposing annual contribution limits against the bequest of Raymond Groves Burrington violate the First Amendment rights of the Libertarian National Committee?

---

[8]    Of course, it is possible that Burrington's heirs or the LNC could take some action in the future that could raise valid anti-corruption concerns.  But that potentiality does not completely eviscerate the LNC's First Amendment claim, because the FEC may be able to address those concerns through its disclosure and rulemaking authority.  Cf. Buckley, 424 U.S. at 109-110 (describing the FEC's recordkeeping, disclosure, investigative, rulemaking, and adjudicative powers).

Because this Court is certifying a question to the en banc Court of Appeals, but not the one drafted by the LNC, Plaintiff's Motion to Certify Facts and Questions (Dkt. No. 25) is **GRANTED IN PART** and **DENIED IN PART**.   Based upon the same logic, Defendant's Motion for Summary Judgment (Dkt. No. 29) is **GRANTED IN PART** and **DENIED IN PART**.  The Court's findings of fact, limited to those facts potentially relevant to the question as certified, are attached as an Appendix.  An Order accompanies this Memorandum.


Date:  March 18, 2013                           _____

                                                ROBERT L. WILKINS
                                                United States District Judge

## APPENDIX
## FINDINGS OF FACT

I.   **The Parties**

1.        Plaintiff Libertarian National Committee, Inc. ("LNC") is the national committee of the Libertarian Party of the United States.  (First Am. Compl. ("Compl.") ¶ 4 (Dkt. No. 13)).

2.        Defendant Federal Election Commission ("Commission" or "FEC") is an independent agency of the United States with exclusive civil jurisdiction over the administration, interpretation, and civil enforcement of the Federal Election Campaign Act ("FECA" or "Act"), 2 U.S.C. §§ 431-57, and other statutes.  The Commission is empowered to formulate policy with respect to FECA (id. § 437c(b)(1)); to make rules and regulations necessary to carry out the Act (id. §§ 437d(a)(8), 438(a)(8), 438(d)); to issue advisory opinions concerning the application of FECA and Commission regulations to any proposed transaction or activity (id. §§ 437d(a)(7), 437f); and to civilly enforce the Act and the Commission's regulations (id. §§ 437c(b)(1), 437g).

3.        LNC is a not-for-profit organization incorporated under the laws of the District of Columbia, which maintains its headquarters in Washington, DC.  LNC has approximately 14,500 current dues paying members, in all 50 states and the District of Columbia. Approximately 278,446 registered voters identify with the Libertarian Party in the 25 states in which voters can register as Libertarians.   Throughout the Nation, 154 officeholders (including holders of nonpartisan offices), are affiliated with the Libertarian Party.  (Redpath Decl., ¶ 2).

4.        LNC's purpose is to field national Presidential tickets, to support its state party affiliates in running candidates for public office, and to conduct other political activities in furtherance of a libertarian public policy agenda in the United States.  (Redpath Decl., ¶ 3).

5.        Founded in 1971, the Libertarian Party has yet to elect a federal office holder, and no current federal office holder is affiliated with the Libertarian Party.  (Redpath Decl., ¶ 4).

6.        The LNC now considers itself the "number one . . . minor party in the United States."  (LNC 30(b)(6) Dep. at 13:3-8, FEC Ex. 20).  The LNC is on the ballot in more states, runs more candidates, and raises more funds than the other minor parties.  (Id. at 13:9-12).   The LNC is the third largest political party, behind the Democratic and Republican Parties, and the LNC is active in all 50 states, with more than 250,000 registered voters.  (Frequently Asked Questions, Libertarian Party, http://www.lp.org/faq (last visited May 1, 2012), FEC Ex. 73).

7.        The Libertarian Party's ability to influence elections is in some measure related to its ability to raise and expend money.  (Ex. C, Response to Request for Admission No. 15).

8.        In any one election cycle, the Libertarian Party typically fields "[n]orth of 200" candidates for federal office.  (LNC 30(b)(6) Dep. at 16:5-7, FEC Ex. 20).  In November 2010, over 800 Libertarian candidates ran for federal, state, and local offices.  (Our History, Libertarian Party, http://www.lp.org/our-history (last visited Apr. 20, 2012), FEC Ex. 23).

9.        "[I]n five of the last six federal elections, 2000 through 2010 inclusive, the exception being 2006, [the LNC's] candidates for U.S. House of Representatives collectively earned more than one million votes in five out of six of those elections.  The last time a minor party, a party other than Democrats and Republicans, did that was in 1912."  (LNC 30(b)(6) Dep. at 13:16-22, FEC Ex. 20).

10.       The Libertarian Party has had "candidates for federal office who have received over 20 percent of the vote [and] possibly over 30 percent."  (LNC 30(b)(6) Dep. at 16:17-17:3, FEC Ex. 20).

11.       At least two former federal officeholders, Ron Paul and Bob Barr, held federal office as Republicans but then switched allegiances to the Libertarian Party after leaving federal office.  (LNC 30(b)(6) Dep. at 17:4-14, FEC Ex. 20).

12.       Even if a Libertarian Party candidate does not win a federal election, the LNC generally views it as positive if its candidate gets more votes than the margin of victory between the two major-party candidates and thus affects the outcome of the election.  (LNC 30(b)(6) Dep. at 11:22-12:12, FEC Ex. 20).  That is because, in that case, "hopefully a candidate of a major party would listen to [the Libertarian Party's] position and reconsider [the Libertarian Party's] positions in the future" since the party would have demonstrated that "a sizeable percentage of the electorate . . . agrees with [the Libertarian Party] and wants to see more Libertarian public policies."  (Id. at 12:13-13:2).

13.       In a 2006 letter to prospective Chairman's Council members, the LNC stated that

    [o]ne of the most significant achievements of the year was our candidates being identified as the deciding factor in control of the U.S. Senate.  This led to positive press coverage in the Washington Post and many other news outlets. Our impact in these important elections even led to an article in The Economist titled "Libertarians Emerge as a Force."  Clearly, it was a good year for our party.

(Ltr. to Robert Balocca (Dec. 8, 2006), FEC Ex. 75).

## II.    Regulatory Framework

14.       "[N]o person shall make contributions—(B) to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $25,000."  2 U.S.C. § 441a(a)(1).

15.     The LNC cannot "solicit, receive or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements" of 2 U.S.C. § 441a(a)(1).  2 U.S.C. § 441i.

16.     The contribution limits applicable to the LNC set forth in Section 441a(a)(1) are indexed for inflation.  2 U.S.C. § 441a(c).

17.     The FEC has construed the term "person," as used in 2 U.S.C. § 441a(a)(1), to include testamentary estates.  (Ex. C, Admission No. 4; Ex. D, FEC Advisory Opinion 2004-02; Ex. E, FEC Advisory Opinion 1999-14).

18.     The LNC is subject to FECA's annual limit on contributions to "political committees established and maintained by a national political party" ("national party committees").  (2 U.S.C. § 441a(a)(1)(B)).  That contribution limit, which is adjusted for inflation in odd-numbered years (id. § 441a(c)(1)), is currently $32,400 (Federal Election Commission:               Contribution              Limits              2013-14, http://www.fec.gov/pages/brochures/contriblimits.shtml (last visited March 18, 2013)).

19.     Like most political parties, the Libertarian Party maintains multiple national party committees.  There are three types of national party committees:  national committees, House campaign committees, and Senate campaign committees.  (11 C.F.R. § 110.1(c)(2)).  The Libertarian Party maintains two national party committees:  The LNC and the Libertarian National Congressional Committee ("LNCC").  (LNCC Statement of Organization, FEC Ex. 1).

20.     FECA's limit on contributions to a national party committee applies separately to each of a political party's national party committees.  (11 C.F.R. § 110.1(c)(3)).  For example, FECA permits an individual who wants to contribute to the Libertarian Party in 2012 to give $32,400 to the LNC and another $32,400 to the LNCC.  (See id.).

21.     The LNC may not receive contributions of bequeathed funds exceeding the limits or prohibitions that would have been applicable to the decedent during his or her lifetime. (FEC Advisory Op. 2004-02).  If an individual dies and bequeaths an amount in excess of an applicable FECA contribution limit to a political committee, the individual's estate may not make a contribution from those bequeathed funds to the political committee that exceeds the applicable FECA contribution limit.  (See id.).  A contribution is made "when the contributor relinquishes control over the contribution," and that occurs when the contribution "is delivered by the contributor to the . . . political committee."  11 C.F.R. § 110.1(b)(6).  An estate has relinquished control over a contribution and delivered it to a political committee if it deposits the contribution in a third-party account (such as an escrow account) over which the recipient political committee can exercise control.  (FEC Advisory Ops. 2004-02, 1999-14).

22.     The LNC has placed advertisements in its newsletter, LP News, seeking testamentary bequests.  (Ex. K).

23.       The option of remembering the LNC in one's will has also been conveyed to delegates at the Party's conventions, and indeed, the LNC intends on soliciting bequests from time to time.  (Redpath Decl., ¶ 16).

24.       Were the Court to enjoin enforcement of federal contribution limits against testamentary bequests to LNC, LNC would immediately launch a comprehensive planned giving program.  LNC would establish a planned giving page for its website, address planned giving through direct mail solicitations, e-mails, personal solicitations, stories in the LNC's newspaper for members, LP News, and through announcements at its National Conventions by the National Chair.  The LNC would also solicit bequests at its presidential nominating convention banquets.  (Redpath Decl., ¶ 17).

## III.    The Burrington Bequest

25.       "[T]he act of a living person causing his or her will to contain a provision that provides for a bequest to a political party upon his or her death" is expressive.  (Ex. C, Response to Request for Admission No. 5).

26.       FEC "views the testamentary estate of a decedent as the successor legal entity to the testator and thus will apply the Act and its limits to that entity as the alter ego of the living testator."  (Ex. H, FEC Advisory Opinion 1983-13).

27.       LNC contributor Raymond Groves Burrington died on April 26, 2007.  (Compl. ¶ 14 (Dkt. No. 13); Resp. to Def.'s Interrog. No. 11, FEC Ex. 5).

28.       Burrington's Last Will and Testament contained a residuary bequest to the Libertarian Party of 25 percent of his estate remaining after the payment of his debts and specific bequests.  (Last Will and Testament of Raymond Groves Burrington at 2, FEC Ex. 6).

29.       On November 13, 2008, the co-executor of Burrington's estate ("Estate") informed the LNC that its 25 percent share of the Estate amounted to $217,734 ("Bequest").  (E-mail from Steven K. Bowling, Howard & Howard, to William Hall (Nov. 13, 2008 8:09am), FEC Ex. 7; Compl. ¶ 14 (Dkt. No. 13)).

30.       The Libertarian Party had no knowledge of Burrington's bequest prior to Mr. Burrington's passing.  (Kraus Decl., ¶ 2).

31.       Apart from the bequest, Burrington had only once donated to the Libertarian Party, in the amount of $25, on May 19, 1998.  (Kraus Decl., ¶ 3).

32.       The bequest of $217,734 is nearly seven times greater than FECA's annual limit on contributions to national party committees (2 U.S.C. § 441a(a)(1)(B)), which was $28,500 when Burrington died in 2007 (Price Index Increases for Expenditure and Contribution Limitations and Lobbyist Bundling Disclosure Threshold, 72 Fed. Reg. 5294-96 (Feb. 5, 2007)) and is $32,400 today (Federal Election Commission: Contribution Limits 2013-14, http://www.fec.gov/pages/brochures/contriblimits.shtml (last visited March 18, 2013)).

33.     The FEC has interpreted FECA to mean that FECA's contribution limits apply to contributions made by an estate, and thus they limit the amount the Burrington Estate may contribute from the Bequest to the LNC each year, just as FECA limited the amount Burrington could have contributed to the LNC each year during his lifetime.  (See FEC Advisory Op. 2004-02 (Feb. 26, 2004), FEC Ex. 8).

34.     Burrington is the only individual ever to bequeath to the LNC an amount in excess of FECA's applicable contribution limit.  (Resp. to Def.'s Interrog. No. 15, FEC Ex. 5).

35.     The FEC has interpreted FECA to mean that an estate is permitted to deposit a bequest that exceeds FECA's applicable contribution limit into a third-party account, and then the estate may make annual, FECA-compliant contributions from that account to a political committee—so long as the political committee does not exercise any control over the undistributed funds in the third-party account.  (See FEC Advisory Op. 2004-02 (Feb. 26, 2004), FEC Ex. 8).

36.     The Burrington Estate made contributions of $28,500 from the $217,734 Bequest to the LNC in December 2007 and March 2008.  (Ltr. from Steven K. Bowling, Howard & Howard, to Robert S. Kraus, Director of Operations, Libertarian Party (Dec. 19, 2007), FEC Ex. 9; Ltr. from Steven K. Bowling, Howard & Howard, to Robert S. Kraus, Director of Operations, Libertarian Party (Mar. 17, 2008), FEC Ex. 10).  The March 2008 contribution check was drawn from the account of "Estate of Raymond Groves Burrington."  (Ltr. from Steven K. Bowling, Howard & Howard, to Robert S. Kraus, Director of Operations, Libertarian Party (Mar. 17, 2008), FEC Ex. 10).

37.     On December 22, 2008, the Estate and the LNC agreed to deposit the remaining $160,734 of the Bequest into an escrow account, from which the escrow agent, Mercantile Bank of Michigan, would distribute annual contributions from the Estate to the LNC in amounts equal to FECA's contribution limit.  (E-mail from Steven K. Bowling, Howard & Howard, to William Hall, Warner Norcross & Judd LLP (Nov. 20, 2007 3:57pm), FEC Ex. 11; Ltr. from William W. Hall, Warner Norcross & Judd LLP, to Melanie Salamone, Mercantile Bank of Michigan (Dec. 22, 2008), FEC Ex. 12; Compl. ¶ 15 (Dkt. No. 13)).

38.     An additional $160,734.00 in 2008 would have covered nearly the entirety of LNC's operating deficit that year.  (Ex. B; Redpath Decl., ¶ 11).  That same amount of money in 2010 would have more than sufficed to cover the Party's ballot access costs.  (Id.).

39.     The escrow account is established pursuant to an agreement among the Estate, the LNC, and the escrow agent, the Mercantile Bank of Michigan.  The agreement provides that the LNC must annually withdraw the maximum amount permitted by the individual contribution limits.  The agreement explicitly provides, however, that the LNC may challenge the legal validity of the contribution limit in federal court, and demand

payment of the full amount remaining in the account should its challenge succeed.  (Ex. G).

40.         From the escrow account, the Estate contributed $30,400 of the Bequest to the LNC in 2009 (LNC FEC Form 3X, Schedule A at C (Jan. 13, 2009), FEC Ex. 13; LNC FEC Form 3X, Schedule A at C (Feb. 3, 2009), FEC Ex. 14), and 2010 (LNC FEC Form 3X, Schedule A at B (Apr. 16, 2010), FEC Ex. 15), and $30,800 in 2011 (LNC FEC Form 3X, Schedule A at A (May 20, 2011), FEC Ex. 16).  The 2009 contribution check to the LNC was drawn from the account of "Mercantile Bank of Michigan Escrow Agent for the Estate of Raymond G. Burrington."  (Ltr. from William W. Hall, Warner Norcross & Judd LLP, to Paul R. Wegener, Vice President, Mercantile Bank at 2 (Jan. 2, 2009), FEC Ex. 17).

41.         The estates of other individuals who bequeathed funds to national party committees in excess of FECA's limits have similarly deposited the bequeathed funds into an escrow account or a trust, and these estates have then made annual, FECA-compliant contributions from those accounts to the national party committees.   For example, in September 2011, the RNC and the Estate of Eleanor Schwarz created an irrevocable trust to hold the $574,432.33 Schwarz bequeathed to the RNC upon her death.  (Declaration in Trust Creating the Eleanor Schwarz Irrevocable Trust for the Benefit of the RNC ("Schwarz Trust Agreement") (Sept. 2, 2011), FEC Ex. 18; Clark Decl., Ex. C at RNC 117, FEC Ex. 2).  The trust agreement states that in order to comply with FECA's contribution limits, the trust will hold the bequest and "shall pay the maximum amount of the trust principal to the RNC as is permitted by the Federal Election Code, on an annual basis."  (Schwarz Trust Agreement at 3, FEC Ex. 18).

42.         LNC does not knowingly associate with dead people.  When LNC learns that a member has passed away, the deceased is removed from the Party's membership rolls.  (Kraus Decl., ¶ 4; Redpath Decl., ¶ 8).

43.         Upon learning of the bequest, LNC removed Burrington from the membership rolls on which he had appeared owing to his 1998 $25 donation.  (Kraus Decl., ¶ 4).

44.         There is no evidence that the Libertarian Party has offered any benefits to Burrington, his family, or his representatives in exchange for being remembered in Burrington's will, apart from perhaps a simple expression of gratitude.

## IV.     Corruption Concerns

45.         National committees of political parties, candidates for federal office, and federal office holders, may grant preferential treatment and access to certain individuals.  (Ex. C, Response to Request for Admission No. 1).

46.         National committees of political parties, candidates for federal office, and federal office holders, may grant preferential treatment and access to potential donors in the unilateral hope that such preferential treatment and access would be remembered with a donation.  (Ex. C, Response to Request for Admission No. 2).

47.     Individuals may donate money to political parties, candidates for federal office, and federal office holders, because they appreciate the treatment and access they are afforded by federal office holders.  (Ex. C, Response to Request for Admission No. 3).

48.     Once a political party receives a testamentary bequest, neither it, nor its candidates, risk offending the deceased donors.  (Ex. C, Response to Request for Admission No. 10).

49.     National political parties are "inextricably intertwined" with their federal officeholders and candidates (McConnell v. FEC, 540 U.S. 93, 155 (2003) (internal quotation marks omitted), overruled in part on other grounds by Citizens United v. FEC, 130 S.Ct. 876 (2010)), with whom they "enjoy a special relationship and unity of interest," (id. at 145.  In fact, "[t]here is no meaningful separation between the national party committees and the public officials who control them."  (Id. at 155 (citations omitted)).

50.     The national party committees of the two major parties—the Democratic Party and the Republican Party—are "both run by, and largely composed of, federal officeholders and candidates."  (McConnell, 540 U.S. at 155).  "The President typically controls his party's national committee, and once a favorite has emerged for the presidential nomination of the other party, that candidate and his party's national committee typically work closely together."  (McConnell v. FEC, 251 F. Supp. 2d 176, 697 (D.D.C. 2003) (Kollar-Kotelly, J.)).  The leaders of the two major parties are also the parties' federal candidates, officeholders, and important Congressional leaders.  (Id. at 469 (Kollar-Kotelly, J.) ("[T]he internal structure of parties permits, for example, former U.S. Senator D'Amato, who chaired the [RSCC] from 1995-97, to at the same time serve as chair of the Senate Banking, Housing, and Urban Affairs Committee.") (alterations in original) (citation omitted)).

51.     Similarly, LNC officials have run for federal office as Libertarian Party candidates while holding their offices with the LNC.  (Deposition of LNC witness William Redpath pursuant to Federal Rule of Civil Procedure 30(b)(6) ("LNC 30(b)(6) Dep.") at 24:16-25:9, FEC Ex. 20).  For example, William Redpath served as the LNC's national chair from July 2006 to late May 2010 (id. at 7:3-4; 8:1-5) and has served as the LNC's treasurer since December 2010 (id. at 7:3-8).  Redpath ran as a Libertarian Party candidate for United States Senate in 2008 and for United States House of Representatives in 2010.  (Id. at 23:1-5, 11-13; 23:20-24:11).  As national chair, Redpath was the LNC's "chief executive officer . . . with full authority to direct [the LNC's] business and affairs."  (Libertarian Party Bylaws and Convention Rules ("LNC Bylaws") at 3, FEC Ex. 21).  The LNC's rules do not bar its leaders from also running for federal office.  (LNC 30(b)(6) Dep. at 24:12-15, FEC Ex. 20).

52.     Political parties are "primarily concerned with electing their candidates" to office.  (McConnell, 251 F. Supp. 2d at 469 (Kollar-Kotelly, J.)).  They have no economic interests apart from this ultimate goal, and thus "the money they raise is spent assisting

their candidates' campaigns." (Id. at 469-70 (citation omitted)).  As a former member of Congress explained:

> The ultimate goal of a political party such as the Democratic Party is to get as many Party members as possible into elective office, and in doing so to increase voting and Party activity by average Party members.  The Party does this by developing principles on public policy matters the Party stands for, and then by finding candidates to run for the various political offices who represent those principles for the Party.  When the Party finds its candidates, it tries to raise money to help get like-minded people to participate in the elections, and to try to get the Party's candidates the resources they need to get their message out to voters.

(Id.).

53.    Similarly, it is the LNC's mission to "move public policy in a Libertarian direction by . . . nominating candidates for political office that are Libertarian and trying to get them elected."  (LNC 30(b)(6) Dep. at 9:17-10:1, FEC Ex. 20).  It is the LNC's goal to "have a Libertarian president and a Libertarian Congress and Libertarians elected to governorships and state general assemblies, state legislatures."  (Id. at 10:6-17).  As the LNC told a donor in 2003, the LNC is "in the business of winning elections" and the donor's "gift goes towards making that happen."  (Ltr. from Joe Seehusen, Executive Director, LNC, to Dr. Charles E. Test (July 17, 2003), FEC Ex. 22).

54.    In any one election cycle, the Libertarian Party typically fields more than 200 candidates for federal office.  (LNC 30(b)(6) Dep. at 16:5-7, FEC Ex. 20).  In November 2010, more than 800 Libertarian candidates ran for federal, state, and local offices.  (See Our History, Libertarian Party, http://www.lp.org/our-history (last visited Apr. 20, 2012), FEC Ex. 23).  The LNC fields the Libertarian Party's candidates for United States president and vice-president, and Libertarian Party candidates for United States Congress are fielded by the party's state-level affiliates (LNC 30(b)(6) Dep. at 15:18-22, FEC Ex. 20), whose charters the LNC can grant and revoke (LNC Bylaws at 2, FEC Ex. 21).

55.    The LNC spends the bulk of its resources on obtaining access to the ballot for its candidates.  (Compl. ¶ 13 (Dkt. No. 13)).  Obtaining ballot access is "probably the most important thing the [LNC] does," since the LNC's "role in this electoral system is to field as many candidates . . . as possible for federal and state and local offices[.]"  (LNC 30(b)(6) Dep. at 32:17-33:14, FEC Ex. 20).  Thus, the LNC funds petition drives for the party's federal candidates (id. at 20:1-9) and works closely with its presidential candidate's campaign on ballot-access issues (id. at 20:11-13; 21:14-18).

56.    In order to receive financial support from the LNC, Libertarian Party candidates must be certified as Libertarian candidates by the governing board of the party in their state and must not support any presidential ticket other than the Libertarian Party's presidential ticket.  (Libertarian National Committee Policy Manual (Nov. 25, 2011) at

39, FEC Ex. 24).  The LNC has the power to take the Libertarian Party nomination away from a presidential ticket that fails to conduct its campaign in accordance with the party's platform.  (LNC Bylaws at 8-9, FEC Ex. 21; LNC 30(b)(6) Dep. at 27:10-19, FEC Ex. 20).

57.         Just like the major parties, the LNC offers its donors membership in various major-donor groups that provide "certain perks" and benefits—including preferential access to the Libertarian Party's federal candidates and high-ranking LNC officials. (LNC 30(b)(6) Dep. at 35:6-36:14, FEC Ex. 20; Libertarian National Committee Policy Manual (Dec. 11, 2011) ("LNC Policy Manual"), FEC Ex. 32).  For example, an LNC donor can become a member of the "Chairman's Circle" for $25,000 annually or $2,500 monthly, and in return, receive "[d]irect contact with [the] National Chair, POTUS [President of the United States] nominee, or significant L[ibertarian] P[arty] candidate during [the] campaign season."   (LNC Policy Manual at 33, 36, FEC Ex. 32). Chairman's Circle members also receive "VIP Seating . . . with [the] National Chair, LNC officer, special guest, or POTUS nominee at [the] National Convention banquet or other events."  (Id. at 36).  The LNC also offers membership in major-donor groups for annual donors of $15,000 ("Select Benefactor"), $5,000 ("Beacon of Liberty"), $2,500 ("Pioneer of Freedom"), or $1,500 ("Lifetime Founder").  (Id. at 33).  In addition to predetermined benefits, LNC staff has the "discretion to create and bestow additional benefits" upon its major-donor group members.  (Id. at 34).

58.         The LNC offers a monthly pledge program in which donors can agree to give a recurring monthly contribution to the LNC, and the LNC will automatically charge the donor's credit card or checking account.  (LNC 30(b)(6) Dep. at 29:22-30:5, FEC Ex. 20).  The monthly pledges continue indefinitely until the donor decides to end the donations.  (Id. at 30:15-22).

59.         Donors can become members of an LNC major donor group on the basis of monthly pledges.  For instance, to become a member of the Chairman's Circle, a donor may either give a lump sum of $25,000, or pledge to give $2,500 monthly.  (LNC Policy Manual at 33, FEC Ex. 32).  For donors who have made a monthly pledge, membership in a particular major donor group "begins at the beginning of the fourth month of the pledge." (Id. at 37).

60.         Members of LNC's top five major-donor groups are also granted membership in the LNC's "Torch Club," which entitles members to attend a special Torch Club event at the LNC's national convention.  (LNC Policy Manual at 37, FEC Ex. 32).  The Libertarian Party's federal candidates can attend this special event so long as they are also Torch Club members, and William Redpath has attended the event while serving as the LNC's national chair and running as a Libertarian Party candidate for federal office. (LNC 30(b)(6) Dep. at 41:1-42:6, FEC Ex. 20).

61.         For at least the last several years, the LNC has maintained major-donor groups that offer preferential-access benefits.  In September 2008, the LNC invited major donors

to a "VIP Wine & Cheese Reception and Candidate Forum," where they could "meet local and national candidates, [and] LNC . . . Board Members." (Libertarian Party VIP Wine & Cheese Reception and Candidate Forum Invitation, FEC Ex. 33). LNC candidates for Vice President, Senate, and House of Representatives attended the event, including William Redpath, who was then the LNC's national chair. (Id.).

62.    In May 2008, the LNC held a "Chairman's Circle Dinner" for Chairman's Circle major-donor group members, attended by then-candidate and national chair William Redpath. (LNC Chairman's Circle Dinner Invitation, FEC Ex. 34).

63.    In 2006, the LNC solicited $5,000 annually from donors to become members of the Chairman's Advisory Council, which offered "monthly conference calls to discuss party matters" with the LNC national chair, "in-depth meetings with . . . key [LNC] headquarters staff," and "a special dinner that will take place at the [LNC's national] convention for council members only, along with key staff members and [the national chair]." (LNC Chairman's Advisory Council Letter (Feb. 9, 2006), FEC Ex. 35).

64.    In 2005, the LNC created a major donor group called the "Chairman's Council," which donors could join for two years with a donation of $5,000. (LNC Chairman's Council Letter at 2-3, FEC Ex. 36). Members of the Chairman's Council "met in regular conference calls and many attended a special, intimate dinner at the 2006 national convention." (Id. at 3).

65.    The LNC offers the benefits of major-donor-group membership as "an inducement to hopefully have people increase their contributions." (LNC 30(b)(6) Dep. at 49:2-5, FEC Ex. 20). And the inducement has worked, as the groups have been effective in attracting larger donations for the LNC. (Id. at 37:9-20). Donations from the "relatively small group of donors" who are members of the LNC's major-donor groups account for a "substantial percentage of LNC revenue." (Id. at 38:6-12).

66.    The LNC offers benefits to its major donors not only as "a way to say thank you for [their] generosity to the [LNC]," but also "as an inducement to hopefully have people increase their contributions." (LNC 30(b)(6) Dep. at 49:2-11, FEC Ex. 20).

67.    The LNC also grants preferential-access benefits to its major donors partly on the basis of their promise to donate more money in the future. For example, a donor can become a member of the LNC's Chairman's Circle—which offers access to the LNC's presidential candidate among other LNC candidates—with either a $25,000 annual donation or "$2500 monthly in dues or contributions" (once $10,000 has been received). (LNC Policy Manual at 33, 36, FEC Ex. 32). If the donor opts for the monthly pledges, "membership at that level begins at the beginning of the fourth month of the pledge." (Id. at 37).

68.    In 2007, individuals bequeathed $23.15 billion to U.S. charities, and in 2008, seven of the 10 largest gifts to charity were given by bequest. (Brian Sagrestano, JD, CFRE, Why You Should Promote Bequests, Planned Giving Mentor (June 2009), http://www.virtualgiving.com/downloads/whitepapers/promotebequests.pdf, FEC Ex.

44).  Bequests are often the largest gifts prospective donors will make "[b]ecause this wealth is transferred at death, when the donor no longer needs it for expenses."  (Id.).

69.      The LNC has received at least three bequests, including the Burrington Bequest. (Resp. to Def.'s Interrogs. at No. 15, FEC Ex. 5).  All three bequests were significantly larger than the LNC's median donation of approximately $25.  (See 30(b)(6) Dep. at 54:6-21, FEC Ex. 20).  Upon his death in 2007, Burrington bequeathed $217,734 to the LNC; yet during his lifetime, he contributed $25 once, in 1998.  (Resp. to Def.'s Interrogs. at Nos. 11, 15, FEC Ex. 5).  Joseph A. Reitano bequeathed $19,331.40 to the LNC in February 2010 and James Kelleher bequeathed $10,000 to the LNC in April 2009.  (Resp. to Def.'s Interrogs. at No. 15, FEC Ex. 5; E-mail from Robert Kraus, Director of Operations, LNC, to William Redpath, Chair, LNC (Feb. 17, 2010 4:46pm), FEC Ex. 45; E-mail from Robert Kraus, Director of Operations, LNC, to Louise Calise, Direct Marketing Manager, LNC (Apr. 27, 2009 10:46am), FEC Ex. 46; Bank Check from the Estate of James Casey Kelleher to Libertarian National Committee (Apr. 22, 2009), FEC Ex. 47).  But neither of those persons has any reported contributions to the LNC during his lifetime.

70.      Over the last several years, individuals have bequeathed very large amounts of money to non-profit organizations.  For example, in 2005, the National Rifle Association received a $1 million bequest from a member and donor.  (Traditions, A Publication of the NRA Foundation (Spring 2005) at 24, http://www.nrafoundation.org/traditions/graphics/spring05.pdf, FEC Ex. 48).  And in 2003, philanthropist Joan Kroc bequeathed more than $200 million to National Public Radio (Press Release, NPR, NPR Receives a Record Bequest of More Than $200 Million (Nov. 6, 2003), http://www.npr.org/about/press/031106.kroc.html, FEC Ex. 49), an amount almost double its then-annual budget (Mike Janssen, Kroc's $200 Million Gift Frees Pubradio's Dreams, Current (Nov. 17, 2003), http://www.current.org/npr/npr0309kroc.shtml, FEC Ex. 50).  Philanthropists recognize that there is potential to raise great sums of money via bequests.  For example, in 2009, Bill Gates and Warren Buffet started an effort to convince the 400 wealthiest Americans to pledge "at least 50% of their net worth to charity during their lifetimes or at death." (Carol J. Loomis, The $600 Billion Challenge, Fortune (June 16, 2010), http://features.blogs.fortune.cnn.com/2010/06/16/gates-buffett-600-billion-dollar-philanthropychallenge/, FEC Ex. 51.)

71.      Many non-profit organizations have sophisticated planned-giving programs that solicit bequests and other forms of planned giving, such as the National Rifle Association (National Rifle Association, Planned Giving Guide, http://nrahq.giftlegacy.com/org_files/170/pdf/PGBrochure.pdf, FEC Ex. 52; see also NRA, Ring of Freedom, http://nrahq.giftlegacy.com/ (last visited March 18, 2013)), the Nature Conservancy (Gift & Estate Planning, The Nature Conservancy, http://www.nature.org/gift-planning/index.htm (last visited March 18, 2013)), the

American Civil Liberties Union (Gifts From Your Will or Trust, ACLU, http://www.aclu.planyourlegacy.org/GIFTbequest.php (last visited Apr. 23, 2012), FEC Ex. 53), and the NAACP Legal Defense Fund (Estate Planning, NAACP, http://www.naacpldf.org/estate-planning (last visited Apr. 23, 2012), FEC Ex. 54). Planned-giving consultants advise groups looking to increase their fundraising on how to more effectively solicit bequests. (See, e.g., PlannedGiving.com, http://www.plannedgiving.com/ (last visited March 18, 2013); Partnership for Philanthropic Planning, http://www.pppnet.org/ (last visited March 18, 2013); Changing Our World, Inc., http://www.changingourworld.com/ (last visited March 18, 2013); Alexander Macnab & Co., http://www.alexandermacnab.com/ (last visited March 18, 2013)).

72.     Estates have contributed more than $2.7 million in bequeathed funds to candidates, national party committees, and other political committees, according to FEC records dating from 1978 through December 13, 2011. (Clark Decl. ¶¶ 1-2, 6 & Table 1, FEC Ex. 2). The actual amount of contributed bequeathed funds is likely even higher, because contribution recipients are not required to inform the FEC that a contribution they received came from a bequest, and if they choose to do so anyway, they are not required to report this information in any standardized manner. (Id. ¶¶ 2-4 & Exs. A-D). As a result, bequests are likely underreported to the FEC. (Id.).

73.     Of the more than $2.7 million that estates have contributed from bequeathed funds from 1978 to 2011 based on FEC records, more than $2.26 million has been contributed to national party committees. (Clark Decl. ¶ 10 & Table 3, FEC Ex. 2). The DNC has received more than $1.03 million of that amount in 55 contributions; the RNC has received more than $874,000 in 83 contributions; the LNC has received more than $195,000 in 12 contributions; and the Green Party of the United States has received more than $101,000 in five contributions. (Id. ¶ 12 & Table 4).

74.     Before BCRA banned soft-money donations to national party committees in 2002, the committees could accept the full amount of a bequest from an estate so long as the committees designated the amount in excess of FECA's contribution limit as soft money—that is, funds purportedly to be used for non-federal-election purposes. (Clark Decl. ¶ 8, FEC Ex.2).

75.     As a result, when soft-money donations to national party committees were legal, estates were able to donate the entire amount of a large bequest in one lump sum. For example, in 2002, the Estate of Martha Huges donated $390,000 from a bequest to the DNC. (Clark Decl. ¶ 7 & Table 2, FEC Ex. 2). In 1999, the Estate of Lola Cameron donated $141,988 from a bequest to the RNC. (Id.). In 1997, the Estate of Gwendolyn Williams donated $133,829 from a bequest to the DNC. (Id.). And in 2002, the Estate of Joan Shepard donated $80,000 to the RNC. (Id.).

76.     Of the more than $2.26 million that all national party committees received in reported contributions of bequeathed funds from 1978 to 2011, more than $1.32 million

consisted of hard-money contributions subject to FECA's limits.  (Clark Decl. ¶ 10 &
Table 3, FEC Ex. 2).  Estates gave national party committees this amount in 147 separate
contributions, all of which had to comply with FECA's applicable limit.  (Id.).  As a
result, the average hard-money contribution from a bequest was $9,041.09.  (Id. ¶ 11).  In
contrast, during the pre-BCRA era when national party committees could accept soft
money, estates donated more than $931,000 from bequests in just 15 separate donations
to the national party committees.  (Id. ¶ 10 & Table 3).  These soft-money donations of
bequeathed funds averaged $62,117.23.  (Id. ¶ 11).

77.     Based on data reported to the FEC from 1978 to 2011, the average soft-money
donation from a bequest to the RNC was $38,728.35 (10 donations), while the average
hard-money contribution of bequeathed funds was $6,669.42 (73 contributions).  (Clark
Decl. ¶ 13 & Table 4, FEC Ex. 2).  The average soft-money donation from a bequest to
the DNC was $135,957.25 (four donations) while the average hard-money contribution of
bequeathed funds was $9,637.15 (51 contributions).  (Id.).  In contrast, the RNC reported
in 2009 that the average contribution it receives is $42.  (Conservative Conversation,
GOP.com,                          Oct.                          2009,
http://www.gop.com/index.php/blog/comments/conservative_conservation1/,   FEC  Ex.
55).  And in the fourth quarter of 2011, President Obama and the DNC received an
average donation of $55.  (Stephanie Condon, Obama Campaign, DNC Bring in $68M in
Fourth Quarter, CBSNews.com, Jan. 12, 2012, http://www.cbsnews.com/8301-
503544_162-57357707-503544/obama-campaign-dnc-bring-in-$68m-in-fourth-quarter/,
FEC Ex. 56).

78.     After BCRA banned soft money donations to national party committees, all
bequeathed funds received by those committees were required to comply with FECA's
annual contribution limit found at 2 U.S.C. § 441a(a)(1)(B).  (Clark Decl. ¶¶ 8-9, FEC
Ex. 2).  Therefore, since BCRA, when a person has bequeathed money to a national party
committee in an amount in excess of FECA's annual limit, the excess funds typically
have been held by the estate or by a third party, such as a trustee or escrow agent, which
has then contributed annual amounts to the national party committee that comply with
FECA's limit.  (FEC Advisory Op. 2004-02, FEC Ex. 8; Clark Decl. ¶ 9 & Exs. C-D,
FEC Ex. 2; Compl. ¶¶ 14-16 (Dkt. No. 13)).  When the recipient of a contribution made
by an estate reports the contribution to the FEC, the report need not state that the
contribution was made from a bequest (Clark Decl. ¶ 9, Exs. C-D, FEC Ex. 2), but
documents obtained from national party committees show that many bequests of amounts
far exceeding FECA's annual contribution limit, like the Burrington bequest, have been
left for national party committees in recent years.

79.     For example, in 2009, Ron Gabriel bequeathed $200,000 to the DNC.  (Ltr. from
Lisa R. Saunders, Senior Trust Officer, Chevy Chase Trust, to Ann Marie Habershaw,
Chief Operations Officer, Democratic National Committee (Jun. 16, 2010), FEC Ex. 57).
Gabriel's trust contributed a FECA-compliant $30,400-portion of the bequest to the DNC

in June 2010, and then the remaining $169,600 was to be placed in an account, from which the trustee would "issue a check for the maximum annual distribution amount to the [DNC] until the funds have been completely distributed." (Id.).

80.      In 2008, Eleanor Schwarz bequeathed $574,432.33 to the RNC (Clark Decl. ¶ 9 & Ex. C, FEC Ex. 2).  The RNC and the Schwarz estate created an irrevocable trust to hold the bequest and to "pay the maximum amount of the trust principal to the RNC as is permitted by the Federal Election Code, on an annual basis." (Schwarz Trust Agreement at 3, FEC Ex. 18).

81.      In 2008, Michael P. Buckley bequeathed $200,000 to the DNC.  (Milman Letter at DNC 000296, FEC Ex. 19).  A trustee contributed $28,500 from that bequest to the DNC in 2008, and the balance was placed in a segregated account "for future delivery to the DNC as allowable by the legal limits applicable from year to year." (Id.).

82.      In 2008, Gladys Innerst bequeathed $267,595.41 to the DNC, and the Innerst Trust contributed $28,500 of that amount to the DNC.   (Schedule of Proposed Distribution for Innerst Trust and Bank Check (July 1, 2008) at DNC 000921, DNC 000923, FEC Ex. 58).

83.      In 2008, Margaret Klackowski bequeathed over $216,000 to be split evenly between the DNC and the New Jersey Democratic Party.  (Ltr. from Amanda LaForge, Chief Counsel, Democratic National Committee, to Honorable Margaret Mary McVeigh, Superior Court of New Jersey (Jun. 18, 2008), FEC Ex. 59).  The DNC informed a New Jersey probate court that the Klackowski estate would need to transfer the bequest to a trust, which "would then be responsible for the disbursement of funds - $28,500 until all of the funds have been disbursed." (Id.).

84.      In 2005, Joseph P. Kramer III bequeathed approximately $190,400 to the DNC. (Ltr. from Clifford H. Tall, Attorney, to Amanda LaForge, Democratic National Committee (Sept. 8, 2009), FEC Ex. 60).  In November 2009, the Kramer estate contributed $30,400 of the bequest to the DNC, in compliance with FECA's limit, while the balance of the bequest remained in an annuity.  (Id.).

85.      In 2005, Harold E. Schooler bequeathed $250,000 to the DNC.  (Ltr. from Megan Hedman, Esq., Compliance Director, to John T. Trevino, Attorney (Aug. 1, 2005), FEC Ex. 61).  That year, the Schooler estate made a $26,700 contribution to the DNC.  (DNC FEC Form 3X, Schedule A at B (Oct. 20, 2005), http://images.nictusa.com/cgi-bin/fecimg/?25971502909, FEC Ex. 62).

86.      In 2001, Lakshmi Bulusu bequeathed more than $100,000 to the Democratic Party.  (Ltr. from John M. Power, Attorney, Power Law Firm LLP, to Sen. Frank R. Lautenberg, Democratic Party (National) (May 5, 2009) at DNC 000441, FEC Ex. 63). In 2010, the Bulusu Living Trust contributed $30,400 from that bequest to each of the Democratic Party's national party committees—the DNC, the DCCC, and the DSCC— for a total of $91,200 in contributions.  (Id. at DNC 000443-47).

87.     If FECA no longer placed limits on contributions resulting from bequests, the LNC would accept a bequest of any size in one lump sum. (LNC 30(b)(6) Dep. at 71:4-10, FEC Ex. 20). A single "large bequest that [the LNC] could accept at once could make a major difference in the operations of the [LNC]." (Id. at 70:2-4). For example, the Burrington bequest of more than $217,000 amounted to approximately one-sixth of the LNC's entire 2010 operating budget. (Id. at 70:19-21). And according to the LNC, it "would be wonderful" if it received a million dollar bequest, which would be nearly the size of its entire 2010 operating budget. (Id. at 70:7-15; 71:8-10).

88.     Given this potential for raising large sums, the LNC would direct more effort to soliciting bequests if they were no longer subject to FECA's limits. (LNC 30(b)(6) Dep. at 69:9-71:3, FEC Ex. 20). For instance, the LNC would implement a planned-giving program to solicit bequests exceeding FECA's current limits. (Compl. ¶ 26 (Dkt. No. 13)). Among other things, that program would "solicit bequests at [the LNC's] presidential nominating convention banquets." (Resp. to Def.'s Interrog. No. 16, FEC Ex. 5). The LNC would also use direct mail and personally solicit "people that [it] ha[s] reason to believe are well-to-do or reasonably so." (LNC 30(b)(6) Dep. at 69:9-21, FEC Ex. 20).

89.     Absent FECA's contribution limits, other national party committees would have an incentive to solicit bequests in amounts exceeding FECA's limits as well. (FEC's First Disc. Reqs. at RFA 10, FEC Ex. 3; LNC's Resp. to FEC's RFAs ¶ 10, FEC Ex. 4).

90.     If a national party committee could solicit individuals to leave bequests of unlimited amounts, in exchange the party could grant the individuals preferential access to one or more of its federal officeholders or candidates. (FEC's First Disc. Reqs. at RFA No. 9, FEC Ex. 3; LNC's Resp. to FEC's RFAs ¶ 9, FEC Ex. 4).

91.     If a national party committee discovered that an individual planned to bequeath it a contribution or donation, the national party committee could, in exchange, grant that individual preferential access to its federal candidates and officeholders. (FEC's First Disc. Reqs. at RFA No. 8, FEC Ex. 3; LNC's Resp. to FEC's RFAs ¶ 8, FEC Ex. 4).

92.     An individual can revoke a bequest before death, and, as the LNC admits, this possibility creates an incentive for a national party committee to limit the risk that a planned bequest will be revoked. (FEC's First Disc. Reqs. at RFA No. 12, FEC Ex. 3; LNC's Resp. to FEC's RFAs ¶ 12, FEC Ex. 4). To make a revocation less likely, a national party committee could grant an individual who has promised the national party committee a bequest preferential access to its officeholders or candidates. (FEC's First Disc. Reqs. at RFA No. 13, FEC Ex. 3; LNC's Resp. to FEC's RFAs ¶ 13, FEC Ex. 4).

93.     The LNC could potentially grant someone membership in one of its major-donor groups, such as the Chairman's Circle, if the person showed the LNC his or her will providing for a bequest large enough to qualify for membership (LNC 30(b)(6) Dep. at 49:17-50:14, FEC Ex. 20), or if the person threatened to revoke such a bequest (id. at 67:11-68:4).

94.     If individuals informed the LNC that they intended to leave the LNC a bequest upon death, the LNC would be thankful to them for "possibly leaving a gift for us some day," since the LNC "need[s] more money." (LNC 30(b)(6) Dep. at 66:4-20, FEC Ex. 20). And the LNC would be grateful to these potential future donors for the possible contributions even though the donors could revoke their bequests before death, because "[t]here would only be upside there, so to speak." (Id. at 66:21-67:6).

95.     Organizations that solicit bequests sometimes offer membership in recognition societies and access to special events to thank and reward donors who have agreed to leave the organizations bequests. (Establishing a Planned Giving Program, The Center on Philanthropy at Indiana University, http://www.philanthropy.iupui.edu/TheFundRaisingSchool/PrecourseReadings/precourse _establishingaplannedgivingprogram.aspx (last visited Apr. 23, 2012), FEC Ex. 64). A recognition society gives an organization a way to "attempt to begin building personal relationships with those donors," to "provide an opportunity to obtain details about their planned gift commitments, [and to] create an opportunity to convert revocable arrangements, like bequests, into irrevocable commitments." (Id.).

96.     The National Rifle Association ("NRA") recognizes people who are planning to leave a bequest by granting them membership in its recognition society called the "[NRA] Heritage Society." (National Rifle Association, Planned Giving Guide at 13, http://nrahq.giftlegacy.com/org_files/170/pdf/PGBrochure.pdf, FEC Ex. 52). The NRA encourages future donors to notify the NRA of their bequest so "NRA staff [can] welcome you into the Heritage Society and thank you for taking this important step." (Id.). Those who provide the NRA with a copy of their will demonstrating their future gift to the NRA are "awarded Ambassador Membership in the Heritage Society and receive a special gift and invitations to members only events." (Id.; see also Estate Planning/Heritage Society, The NRA Foundation, http://www.nrafoundation.org/giving/planned_giving.asp (last visited March 18, 2013)).

97.     Similarly, the Nature Conservancy solicits bequests by informing potential donors that they "can become a member of The Legacy Club by naming the Nature Conservancy in [their] will or estate plan[.]" (The Legacy Club, The Nature Conservancy, http://www.nature.org/gift-planning/legacy-club/index.htm (last visited March 18, 2013)). The Legacy Club is the Nature Conservancy's way to "recognize this profound contribution to The Nature Conservancy's future" (id.), and as a member, future donors "get special invites and opportunities to protect important wildlife habitats near you." (Share Your Bequest with the Conservancy, The Nature Conservancy, http://my.nature.org/forms/bequest.html (last visited March 18, 2013)).

98.     The Kennedy Center established a "Legacy Society" to "celebrate and thank those individuals" who have left a bequest for the Kennedy Center. (Legacy Society, The Kennedy Center, http://www.thekennedycenterinc.org/giving/planned-giving/legacy-society/legacy-society.html (last visited March 18, 2013)). Legacy Society members are

"recognized in our publications and on our web site," and "[a]s another way to show our appreciation, Legacy members will be able to attend our annual Endowment Event as our special guests."  (Id.).

99.        Family, friends, and estate and trust administrators of a decedent who has left a bequest for a national party committee sometimes take a strong interest in how the party spends the bequest, and they may request that the funds be used to influence specific federal elections.  For example, in 2010, the trustee of a trust holding a $200,000 bequest to the DNC wrote a letter to the then-chair of the DNC stating:

> Due to the fact that mid-term elections are upon us, I [am] working to get this [contribution from the decedent's bequest] out to you as quickly as possible.  I know it would be important to my friend, Michael Buckley, who we called "Buckley."  Of course I cannot speak with him, as he is deceased, but both of us were kindred spirits with regard to our political views and had many, many discussions on politics.  As you can see by the fact that he left the [DNC] 25% of his estate, it was a very important thing to him.  While I believe he would want you to use the money in the way you think best, it is my heartfelt belief that he would want this year's money going towards defeating Carly Fiorina and Meg Whitman in California.  Buckley was a former employee of Hewlett Packard under the reigns of Carly Fiorina and he was not silent with regard to how he felt about her.  I think he would be actively campaigning against her and Meg Whitman, if he were alive today.

(Milman Letter at DNC 000297, FEC Ex. 19).  The trustee then asked the DNC to let her know if the money would in fact be used to help defeat Fiorina and Whitman, because the decedent's "friends would be pleased to know."  (Id.).

100.       Similarly, associates of a decedent who has left a bequest for a national party committee may inform specific federal officeholders or candidates of the bequest, just as major donors did during the soft-money era.  In 2009, an attorney representing the co-trustees of a trust holding a bequest of over $100,000 for the Democratic Party wrote a letter to United States Senator Frank Lautenberg informing him of the bequest.  (Letter from John M. Power, Attorney, Power Law Firm LLP, to Sen. Frank R. Lautenberg, Democratic Party (National) (May 5, 2009) at DNC 000441-42, FEC Ex. 63).  The attorney stated that his "good friend and accountant" who "had interactions with [the Senator] in his role as a director of Holy Name Hospital" suggested that he alert the Senator to the bequest.  (Id. at DNC 000441).  The attorney sent Senator Lautenberg a copy of the trust documents and in doing so highlighted the fact that the bequest was for more than $100,000.  (Id. at DNC 000441-42).

101.       In April 2009, the LNC learned that it was to receive a $10,000 bequest from the estate of James Kelleher.  (E-mail from Robert Kraus, Director of Operations, LNC, to Louise Calise, Direct Marketing Manager, LNC (Apr. 27, 2009 10:46am), FEC Ex. 46).

Upon learning of the bequest in an e-mail, the LNC's then-national chair asked, "Whom do we thank?," even though Kelleher was deceased. (<u>Id.</u> at 2). According to the LNC, in the case of a bequest it "would be reasonable to thank anybody who was helping to [e]ffect the donation" to the LNC, including "[p]ossibly the executor. Possibly the estate administrator or the estate attorney." (LNC 30(b)(6) Dep. at 58:6-13, FEC Ex. 20). As the LNC sees it, "[s]omebody is doing something to give $10,000 to the [LNC], even if a penny is not coming out of their pocket, it is not inappropriate and mighty inexpensive to say thank you." (<u>Id.</u> at 58:14-18). For the Kelleher bequest, the LNC's director of operations directed a colleague to send a thank you note to the executor of the Kelleher estate. (E-mail from Robert Kraus, Director of Operations, LNC, to Louise Calise, Direct Marketing Manager, LNC (Apr. 27, 2009 10:46), FEC Ex. 46).

102.    Redpath, testifying on behalf of the LNC, stated that upon receiving a bequest for the LNC, "I would guess I would ask that the family be thanked, if I had responsibility for it," because it is "[b]etter to err on the side of thanking than not, I guess." (LNC 30(b)(6) Dep. at 63:13-64:12, FEC Ex. 20). "I think to be a decent person and to have them think better of the [LNC] and the Libertarian Party, I would want it to be done." (<u>Id.</u> at 64:15-18).

103.    In February 2010, the LNC discovered that it was to receive a bequest from Joseph A. Reitano that could be valued up to $126,700. (E-mail from Robert Kraus, Director of Operations, LNC, to William Redpath, Chair, LNC (Feb. 17, 2010 4:46pm), FEC Ex. 45). The LNC has a database containing the names of its members and donors (LNC 30(b)(6) Dep. at 59:14-21, FEC Ex. 20), and the LNC's operations director researched whether any of Reitano's family members had been previous donors to the LNC (Federal Rule of Civil Procedure 30(b)(6) Deposition of LNC witness Robert Kraus at 21:15-18, FEC Ex. 67). He conducted this search because usually if the LNC "receive[s] a gift we would send a thank you letter to someone." (<u>Id.</u> at 22:2-4). The operations director discovered that Reitano's son, Tom Reitano, was "a one time $25 subscriber" to the LNC, but his father and mother could not be found in the LNC database. (E-mail from Robert Kraus, Director of Operations, LNC, to William Redpath, Chair, LNC (Feb. 17, 2010 4:46pm), FEC Ex. 45).

104.    Reitano's bequest to the LNC ultimately amounted to $19,331.40. (Resp. to Def.'s Interrogs. at No. 15, FEC Ex. 5). Had Reitano contributed that amount to the LNC while alive, he would have qualified for membership in the LNC's Chairman's Circle major-donor group, which today offers preferential access to the LNC's presidential nominee and other federal candidates. (LNC Policy Manual at 33, FEC Ex. 32). Had Reitano's son asked, the LNC could have allowed him to become a member of the Chairman's Circle in his father's place. (LNC 30(b)(6) Dep. at 65:1-17, FEC Ex. 20). The LNC has no rules that would bar such a substitution. (<u>Id.</u> at 65:16-17).

105.    Individuals have bequeathed contributions directly to federal candidates and their authorized political committees. (Clark Decl. ¶ 14 & Table 5, FEC Ex. 2). Such

contributions are subject to FECA's limit on contributions to "any candidate and his authorized political committees" (2 U.S.C. § 441a(a)(1)(A)), which currently stands at $2,600 per election (Federal Election Commission:   Contribution Limits 2013-14, http://www.fec.gov/pages/brochures/contriblimits.shtml (last visited March 18, 2013)).

106.        From the time the Commission started keeping records in 1978 until the end of 2011, 180 contributions of bequeathed funds from estates to federal candidates, totaling $79,511.35, have been reported.  (Clark Decl. ¶ 14 & Table 5, FEC Ex. 2).  For example, Gilda J. Hardtke bequeathed $5,000 to the DNC and $3,000 to the "Hillary Clinton Election Committee."   (Hardtke Trust Declarations at DNC 000484, FEC Ex. 69).  Similarly, Mary Katherine Frinks bequeathed 20 percent of her estate to "Barack Obama's campaign fund."  (Last Will and Testament of Mary Katherine Frinks (Dec. 21, 2007) at DNC 000606, FEC Ex. 70).  Gladis Innerst bequeathed shares of her residuary estate to "SENATOR ALAN CRANSTON, if he is still a member of the United States Senate," (Trust Agreement, Gladis Innerst (Oct. 1, 1990) at DNC 000880, FEC Ex. 71), and to "CONGRESSMAN GEORGE BROWN, if he is a member of the House of Representatives of the United States Congress at the time of the Trustor's death."  (Amendment to the Gladis Innerst Trust of Oct. 1, 1990 (Jan. 30, 1996) at DNC 000894, FEC Ex. 72).